*Decision will be entered under Rule 155.*

Ernest C. Ramsay and Barbara G. Ramsay, et al.,[1] Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 8818–81, 20883–81,    Filed November 27, 1984.
21664–81, 23213–81,
25549–81, 27339–81,
28096–81, 30823–81,
31172–81, 3178–82,
5770–82, 8063–82,
9093–82, 10734–82,
10922–82, 10976–82,
11320–82, 14327–82,
19514–82, 28410–82.

[1]Cases of the following petitioners are consolidated herewith: R. Craig Peyton, docket No. 20883–81; Mary E. Webster, docket No. 21664–81; Richard R. Hayes, docket No. 23213–81; Wallace F. Williams and Marlene Williams, docket No. 25549–81; Richard R. Hayes and Joellen D. Hayes, docket No. 27339–81; John E. Muroski and Jeanne Muroski, docket No. 28096–81; John W. Keffer

*Harry Winderman*, for the petitioners.
*Avery Cousins III*, for the respondent.

STERRETT, *Judge*: Respondent issued statutory notices of deficiency in these consolidated cases which determined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 8818–81 | Ernest C. Ramsay | 1977 | $7,663.00 |
| | and Barbara G. Ramsay | 1978 | 8,924.00 |
| 20883–81 | R. Craig Peyton | 1978 | 8,091.50 |
| 21664–81 | Mary E. Webster | 1977 | 4,123.00 |
| | | 1978 | 8,275.00 |
| | | 1979 | 6,610.00 |
| 23213–81 | Richard R. Hayes | 1978 | 20,662.00 |
| 25549–81 | Wallace F. Williams | 1978 | 19,392.00 |
| | and Marlene Williams | 1979 | 808.00 |
| 27339–81 | Richard R. Hayes | 1977 | 12,961.00 |
| | and Joellen D. Hayes | | |
| 28096–81 | John E. Muroski | 1977 | 19,713.00 |
| | and Jeanne Muroski | 1978 | 21,236.00 |
| 30823–81 | John W. Keffer | 1978 | 101,276.75 |
| | and Dana V. Keffer | | |
| 31172–81 | Alice M. Andre Norton | 1976 | 29,438.34 |
| | | 1977 | 24,911.58 |
| | | 1978 | 62,833.87 |
| 3178–82 | Sewell K. Loggins | 1975 | 1,462.00 |
| | and Mary S. Loggins | 1978 | 40,417.00 |

and Dana V. Keffer, docket No. 30823–81; Alice M. Andre Norton, docket No. 31172–81; Sewell K. Loggins and Mary S. Loggins, docket No. 3178–82; William A. Hamilton and Nan D. Hamilton, docket No. 5770–82; Archie V. Slack and Elizabeth Slack, docket No. 8063–82; James E. Nance and Carrie M. Nance, docket No. 9093–82; James E. Meeks and Edith S. Meeks, docket No. 10734–82; Wyatt H. Blake III and Jeanne T. Blake, docket No. 10922–82; A. Habib, docket No. 10976–82; Joseph J. Grollo, docket No. 11320–82; Erik C. Larsen and Martha D. Larsen, docket No. 14327–82; H. William Gilmore and Sharon L. Gilmore, docket No. 19514–82; and Jimmie R. Seaton, docket No. 28410–82.

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 5770–82 | William A. Hamilton | 1977 | $9,413.00 |
| | and Nan D. Hamilton | 1978 | 11,276.00 |
| 8063–82 | Archie V. Slack | 1978 | 21,304.25 |
| | and Elizabeth Slack | | |
| 9093–82 | James E. Nance | 1977 | 3,859.00 |
| | and Carrie M. Nance | 1978 | 5,166.00 |
| 10734–82 | James E. Meeks | 1978 | 34,983.00 |
| | and Edith S. Meeks | | |
| 10922–82 | Wyatt H. Blake III | 1978 | 10,133.77 |
| | and Jeanne T. Blake | | |
| 10976–82 | A. Habib | 1978 | 9,046.76 |
| 11320–82 | Joseph J. Grollo | 1978 | [2]16,071.00 |
| 14327–82 | Erik C. Larsen | 1978 | 472.00 |
| | and Martha D. Larsen | | |
| 19514–82 | H. William Gilmore | 1978 | 15,829.00 |
| | and Sharon L. Gilmore | | |
| 28410–82 | Jimmie R. Seaton | 1974 | 219.00 |
| | | 1975 | 1,029.00 |
| | | 1976 | 899.00 |
| | | 1977 | 5,197.24 |
| | | 1978 | 4,045.90 |

The determined deficiencies in these cases primarily arise out of petitioners' participation in Resources America, Inc.'s Venus and Boss silver/gold investment projects and its Rosedale and Great London gold investment projects, which were offered to investors during 1977 and 1978.[3] Additional issues presented in docket No. 31172–81 were severed for purposes of our decision herein, due to their complex nature. Moreover, respondent has conceded additional minor issues pertaining to sections 162 and 274, I.R.C. 1954, in docket Nos. 3178–82 and 19514–82.

The parties have raised a number of issues, the primary ones of which are:

(1) Whether participation by petitioners in the subject mining investment projects constituted an activity engaged in for profit; and

---

[2]Respondent also determined that Joseph J. Grollo was liable for an addition to tax under sec. 6651(a)(1) in the amount of $575 for failure to file his 1978 return within the time prescribed by law. This addition to tax was not alluded to at trial or on brief. Therefore, we must conclude that Mr. Grollo has either conceded the question or failed to carry his burden of proof with respect thereto.

[3]The determined deficiencies for years other than 1977 and 1978 are the result of adjustments made with respect to 1977 and 1978.

(2) Whether petitioners are entitled to deductions in accordance with section 1.612–3(b)(3), Income Tax Regs., for certain claimed "advanced minimum royalties."

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioners Ernest C. Ramsay and Barbara G. Ramsay, husband and wife, resided in Stone Mountain, GA, at the time they filed their petition in docket No. 8818–81. On their 1977 and 1978 income tax returns, they deducted losses of $31,250 in connection with the Venus silver/gold investment project.

Petitioner R. Craig Peyton resided in Tampa, FL, at the time he filed his petition in docket No. 20883–81. On his 1978 income tax return, he deducted a loss of $18,750 in connection with the Great London gold investment project.

Petitioner Mary E. Webster resided in Boca Raton, FL, at the time she filed her petition in docket No. 21664–81. On her 1977 income tax return, she deducted a loss of $93,750 in connection with the Venus silver/gold investment project. On her 1978 income tax return, she deducted a loss of $100,000 in connection with the Boss silver/gold investment project.

Petitioner Richard R. Hayes resided in Winter Park, FL, at the time he filed his petition in docket No. 23213–81. On his income tax return for 1978, he deducted a loss of $31,250 in connection with the Boss silver/gold investment project, and a loss of $18,750 in connection with the Great London gold investment project.

Petitioners Wallace F. Williams and Marlene Williams, husband and wife, resided in Jacksonville, FL, at the time they filed their petition in docket No. 25549–81. On their 1978 income tax return, they deducted a loss of $37,500 in connection with the Great London gold investment project.

Petitioners Richard R. Hayes and Joellen D. Hayes, husband and wife, resided in Winter Park, FL, at the time they filed their petition in docket No. 27339–81. On their 1977 income tax return, they deducted a loss of $31,250 in connection with the Boss silver/gold investment project.

Petitioners John E. Muroski and Jeanne Muroski, husband and wife, resided in Orlando, FL, at the time they filed their

petition in docket No. 28096–81. On their 1977 and 1978 income tax returns, they deducted losses of $31,250 in connection with an unspecified silver mining project.

Petitioners John W. Keffer and Dana V. Keffer, husband and wife, resided in Chesapeake, VA, at the time they filed their petition in docket No. 30823–81. On their 1978 income tax return, they deducted a loss of $187,500 in connection with the Rosedale gold investment project.

Petitioner Alice M. Andre Norton resided in Winter Park, FL, at the time she filed her petition in docket No. 31172–81. On her 1977 income tax return, she deducted a loss of $50,000 in connection with an unspecified silver mining project. On her 1978 income tax return, she deducted a loss of $50,000 in connection with the Great London gold investment project.

Petitioners Sewell K. Loggins and Mary S. Loggins, husband and wife, resided in Atlanta, GA, at the time they filed their petition in docket No. 3178–82. On their 1978 income tax return, they deducted a loss of $93,750 in connection with the Great London gold investment project.

Petitioners William A. Hamilton and Nan D. Hamilton, husband and wife, resided in Stone Mountain, GA, at the time they filed their petition in docket No. 5770–82. On their 1977 and 1978 income tax returns, they deducted losses of $31,250 in connection with the Venus silver/gold investment project.

Petitioners Archie V. Slack and Elizabeth Slack, husband and wife, resided in Sheffield, AL, at the time they filed their petition in docket No. 8063–82. On their 1978 income tax return, they deducted a loss of $46,875 in connection with the Great London gold investment project.

Petitioners James E. Nance and Carrie M. Nance, husband and wife, resided in Lilburn, GA, at the time they filed their petition in docket No. 9093–82. On their 1977 and 1978 income tax returns, they deducted losses of $16,687 and $15,625, respectively, in connection with the Venus silver/gold investment project.

Petitioners James E. Meeks and Edith S. Meeks, husband and wife, resided in Florence, AL, at the time they filed their petition in docket No. 10734–82. On their 1978 income tax return, they deducted a loss of $75,000 in connection with the Great London gold project.

Petitioners Wyatt H. Blake III and Jeanne T. Blake, husband and wife, resided in Sheffield, AL, at the time they filed their petition in docket No. 10922–82. On their 1978 income tax return, they deducted a loss of $31,250 in connection with the Rosedale gold investment project.

Petitioner A. Habib resided in Altamonte Springs, FL, at the time he filed his petition in docket No. 10976–82. On his 1978 income tax return, he deducted a loss of $25,000 in connection with the Great London gold investment project.

Petitioner Joseph J. Grollo resided in Chicago, IL, at the time he filed his petition in docket No. 11320–82. On his 1978 income tax return, he deducted a loss of $37,500 in connection with the Great London gold project.

Petitioners Erik C. Larsen and Martha D. Larsen, husband and wife, resided in Winter Park, FL, at the time they filed their petition in docket No. 14327–82. On their 1978 income tax return, they deducted a loss of $2,767 in connection with the Rosedale gold project.

Petitioners H. William Gilmore and Sharon L. Gilmore, husband and wife, resided in Indianapolis, IN, at the time they filed their petition in docket No. 19514–82. On their 1978 income tax return, they reported a loss of $31,250 in connection with the Rosedale gold investment project.

Petitioner Jimmie R. Seaton resided in Spring, TX, at the time he filed his petition in docket No. 28410–82. On his 1977 and 1978 income tax returns, he deducted losses of $31,250 in connection with the Venus silver/gold investment project.

All of the losses in question were attributable to deductions for purported "advanced minimum royalties." Petitioners did not report any income from the investment projects during the years in question.

The income tax returns for the periods involved were filed by each of the petitioners in the appropriate office of the Internal Revenue Service.

The parties have stipulated that the Court's decision in docket No. 8818–81 with respect to issues arising out of petitioner Ernest C. Ramsay's participation in Resources America, Inc.'s Venus silver/gold investment project should be determinative of similar issues presented in the remaining docket numbers. Accordingly, when used hereinafter in the singular, "petitioner" will refer to Ernest C. Ramsay. More-

over, our findings of fact generally will be tailored to a discussion of the Venus project, which the record indicates was operated in substantially the same manner as the other investment projects in question.

In 1977 and 1978 Resources America, Inc. (Resources), offered to investors a number of mining investment projects, including the Venus, Boss, Rosedale, and Great London projects.[4] Resources was the purported owner of a number of mining claims that were to be used for mining in the different projects. The mining claim that was to be used in the Venus project was the Peter B#1 claim. This claim was located in Socorro County, NM, in the Magdalena Mining District. The various investment projects were set up with Resources acting as "lessor" and the investors, such as petitioner, acting as "lessees."

The president, sole stockholder, and manager of Resources was Bernard Van Zyl. Mr. Van Zyl had a mechanical engineering degree, but he did not have a mining or geology degree, and his first experience with mining activities occurred in 1976.

Each of the projects involved the participation of an "operator," which was to be responsible for the management and affairs of the projects. U.S. Mining & Milling Corp. (USMM), which in 1979 became Minerex, Inc. (Minerex), served as the operator. The corporation purchased a mill in San Antonio, NM, in 1977, which purportedly was to be used for processing mineral deposits. USMM, like Resources, was wholly owned by Mr. Van Zyl. Gregory Patulea was hired as vice-president of USMM in July 1977. In early 1978, Mr. Patulea was discharged and Ronald G. Morgensen was hired to replace him. Mr. Morgensen's background was unclear. He purportedly claimed to have a mining engineering degree, but USMM was unable to confirm that degree. Mr. Morgensen worked for USMM for 6 to 8 months and then was discharged for alleged incompetence. Mr. Morgensen was replaced by Dave Smith, who worked for the company approximately 2 years.

In 1977, Resources prepared and issued a private placement memorandum (offering memorandum) offering for sale 20 undivided leasehold interests, called "units" in the Venus

---

[4]Resources offered at least one other similar project, the Gregory silver/gold investment project, during the years involved in this litigation.

project. The subscription price per unit was $20,000. An investor could subscribe for a minimum of one-half unit.

Mr. Van Zyl, whose office was located in Winter Park, FL, oversaw the compilation of the offering memorandum for the Venus project and personally prepared taxable income and cash flow projections included therein. In this endeavor, he relied on the advice, especially the tax advice, of John B. Bamberg, Resources' attorney. Renee Potter, Resources' secretary, typed all of the offering memoranda, including the memorandum for the Venus project. The Venus project offering memorandum contained, inter alia, a "Registered Geologists Report," an assay report, a calculation of reserves, a tax opinion, an "Operating Agreement," a lease agreement, nonrecourse notes, and a security agreement.

The "Registered Geologists Report" was prepared by Dale Carlson, who was a geologist, but not a registered geologist. The report was prepared in 1976 or 1977, after Mr. Carlson was asked, on behalf of Mr. Patulea, to do a "quick job of sampling" the Peter B#1 claim and to write a "brief report" on his findings. Mr. Carlson was under the impression that Mr. Patulea owned the property. He was not aware that his report was intended to be used by Resources. Pursuant to this request, Mr. Carlson took only six separate samples at the Peter B#1 site from three separate areas. These samples were then assayed.

The assay report contained in the offering memorandum showed an analysis of two samples. The assay results from one sample indicated 3.2 ounces per ton of gold and 3.25 ounces per ton of silver. The assay results from the second sample indicated 3.2 ounces per ton of gold and 2.9 ounces per ton of silver. The report was entitled "Official New Mexico Bureau of Mines Assay Report" and was signed by Robert Blackmore, who apparently was an undergraduate student working in the bureau's assay laboratory. An employee of the New Mexico Bureau of Mines is not permitted to prepare an assay report and entitle it in the above-described manner, because the bureau is a State agency, whose policy generally prohibits competition with private assay laboratories.

The calculation of reserves included in the offering memorandum stated that the volume of the ore deposit on the Peter B#1 claim was 4,500,000 feet; that the density of the ore was

450,000 tons; and that assuming a 20-percent recovery of the gold and silver, the value of a ton of ore was $110. Although it is not entirely clear, apparently Mr. Van Zyl or Mr. Patulea prepared the calculation of reserves and, in doing so, relied exclusively on the geology and assay reports.

The legal opinion included in the offering memorandum was prepared by Mr. Bamburg and dealt solely with the potential tax consequences to investors. Although generally favorable, the opinion did contain the usual caveats and specifically noted that "As the Program is a transaction planned with a view to tax benefits, it is therefore subject to some special precautionary considerations." In this connection, the opinion mentioned the heightened risk of audit, since "It is anticipated that tax deductions * * * will, in the early phases of operation * * *, exceed any possible income from operations." The offering memorandum had itself promised a 3.125-to-1 writeoff in 1977.

Petitioner reviewed the offering memorandum and sub-scribed to one-half of a unit in the Venus project. On December 23, 1977, he executed the lease agreement contained in the offering memorandum, which in pertinent part read as follows:

1. In consideration of the rents and royalties herein reserved and to be paid by the Lessee to the Lessor [Resources] as herein provided and of the terms, conditions and convenants herein contained, Lessor does hereby demise and lease unto the Lessee for a period of 3 years, commencing 12–23–77, subject to extension or prior termination as hereinafter provided, the sole and exclusive right to mine and remove all of the minerals located on the Property by whatever methods of mining Lessee deems appropriate * * *

2. If, at the termination of the term of this Lease, the Lessee shall not be in default under the terms hereof in any respect whatsoever, then this Lease shall be automatically renewed for an additional period of ____ years. Likewise, if at the end of said renewal period of the mining operations, the Lessee shall not then be in default under the terms hereof in any respect whatsoever, then this Lease shall be automatically renewed for an addition-al period of one years [sic] or until all mineable and merchantable minerals have been removed. Any such extension shall be subject to all of the terms and provisions hereof. Notwithstanding anything herein to the contrary this Lease shall be automatically terminated by the exhaustion of the minerals prior to the end of such term or extended term.

3. Lessee agrees to pay during the term of the Lease, royalties in an annual amount of 20% until investment is recouped through 50% for reaminder [sic] of Lease of the gross sale price of minerals mined, sold and

delivered from the Property (the "Base Royalty"), but not less than a non-refundable minimum royalty of $62,500 x ½, per annum. The first year of the non-refundable minimum royalty of $62,500 x ½, is to be due and delivered upon the signing of this Lease in the form of (1) $20,000 x ½ in cash, and (2) nonrecourse note bearing interest at the rate of 6% per annum in the form of Exhibit "C" attached hereto in the amount of $42,500 x ½. Accordingly, the Lessee shall deliver his pro rata share of the cash portion of the non-refundable royalty and issue his non-recourse notes representative of his pro rata share of the amount due upon the execution of this Lease. The fourth minimum annual royalty due in the fourth year of this Lease and each year thereafter will be paid in cash.

4. The cash portion of the Advance Minimum Royalty shall be recouped and offset against the Base Royalty, if any, becoming due and payable under this Lease.

\* \* \* \* \* \* \*

7. In the event Lessee fails to make the royalty payments to the Lessor as herein provided and remains in default thereof for a period of more than six months, after written notice of such default, this Lease shall terminate automatically.

Mr. Van Zyl and Mr. Bamberg determined the amount of "annual royalty payments" that investors would be required to make. The determination primarily was based on tax considerations, specifically, on achieving a multiple tax write-off.

On December 27, 1977, petitioner executed the nonrecourse note and security agreement included in the offering memorandum. By execution of the note, petitioner promised to pay Resources the principal sum of $21,250, together with interest on the unpaid balance computed at the rate of 6 percent per annum. The note provided, in part, as follows:

This Note is one of a series of three (3) Notes in the aggregate sum of $83,750.00 issued by the undersigned to the Payee pursuant to the terms of a certain lease of even date between the Payee and the Undersigned and is secured by Security Agreement of even date herewith between the Payee and the Undersigned (the "Security Agreement").

\* \* \* \* \* \* \*

It is understood and agreed that in the event of default in payment of any Note in the series, including accrued interest thereon, which default shall continue for a period of two years, then, at the option of the holder of any said Notes after six (6) months notice of such default to the undersigned, then all or any part of the remaining unpaid Notes together with interest thereon shall forthwith become due and payable. \* \* \*

On default hereunder, no deficiency of [sic] other personal judgment shall be rendered or entered against the undersigned. Recourse will be to the Lease only, payable from the royalties as collected.

The security agreement purported to grant and convey to Resources a security interest in petitioner's undivided lease-hold interest and provided, in part, as follows:

The first Note in the series is due and payable on the December 31, 1980 [sic] with each subsequent Note thereof due and payable three years after date.

The Secured Party covenants and agrees that payment for Notes by Debtor in the principal sum * * * shall be made only to the extent of 50 percent of minerals mined, sold and delivered from the Collateral.

If any payment of the principal amount of any Note of the series, or interest thereon, is in default for more than two (2) years, or interest thereon, is in default for more than two (2) years, the Secured Party and/or assigns, after six (6) months' written notice, may declare the entire unpaid balance of the Notes in the series and any accrued interest thereon in default.

* * * * * * *

The Debtor shall not be personally liable for the payment of the principal obligation evidenced by any Note in the aforementioned series, nor for any accrued interest thereon, nor for any costs of collection or attorneys' fees, it being understood that the Debtor [sic] shall look only to the Collateral, and to the proceeds and profits generated therefrom, for the satisfaction of the Notes and interest thereon, if any, shall become due and payable whether by default declared in the payment of principal or interest when due, or upon maturity, the Secured Party shall not be entitled to obtain a deficiency judgment against the Debtor for any portion of the principal obligation evidenced by the Notes or any accrued but unpaid interest thereon, nor for any costs of collection or attorneys' fees.

As contemplated in the first nonrecourse note and the security agreement, petitioner later executed two additional nonrecourse notes, both of which were dated December 1, 1978, and both of which were in the principal sum of $31,250. Petitioner also made cash payments to Resources, evidenced by checks drawn on December 23, 1977, and March 30, 1978, in the respective amounts of $8,000 and $2,040.

On January 1, 1978, petitioner executed the "Operating Agreement" contained in the offering memorandum. Under that agreement, USMM agreed generally to conduct, oversee, and supervise the maintenance and day-to-day operations of the Venus project's property, to enter into mining contracts, to act as sales agent for the disposition of mineral products, to

cause all necessary tax returns, reports, and other filings to be made, to execute and file Government documents, and to perform a myriad of other services on behalf of the investors in the Venus project. USMM specifically agreed to cause accurate books of account to be kept and an accurate record of the operation of the property and all transactions conducted on behalf of the investors. In return, the investors agreed to pay USMM an amount equal to 2 percent of the net revenues, subject to an annual increase of 3-percent-per-year cost of living escalation. The investors also agreed to reimburse USMM for all reasonable out-of-pocket expenses incurred in the performance of services under the agreement. In addition, the investors agreed to bear all costs and liabilities incurred in the exploitation and development of the property. The "Operating Agreement" contained the following provisions with respect to the tax status of the Venus project:

The Project hereby elects under Section 761 of the Internal Revenue Code of 1954 * * * not to be subject to Subchapter K of the Code and the Participants hereby authorize, empower, and direct the Operator to cause the Project to elect not to be subject to Subchapter K of the Code in accordance with the Treasury Regulations thereunder. Each Participant, by executing this Agreement, agrees not to take any action which would invalidate the Project's election to exclude the Project from the provisions of Subchapter K of the Code.

On December 22, 1977, Resources sent a letter to Venus project investors, stating, in part, as follows:

In the event the Internal Revenue Service attacks the tax treatment used in royalty payment deductions or the Section 761(a) election not to be subject to the Partnership provisions of Subchapter K, Resources America Corporation will, at your request, provide legal representation and other appropraite [sic] defense without cost to you, to support and maintain the projected tax treatment. Such support shall include defense in the U.S. Tax Court and Court of Appeals, if necessary.

Resources sent investors Schedule C samples for use in reporting any income and deductions attributable to participation in the Venus project. Petitioner elected the accrual method of reporting on his Schedule C, and he claimed a "minimum advance royalty" of $31,250 as a business expense and a net business loss on the Venus project in an equal amount in each of his taxable years 1977 and 1978. USMM

later advised petitioner that, because of a change in the tax laws, he could not claim a loss in 1979. Petitioner's 1979 tax return contained no reference to the Venus project. On his Schedule C attached to his 1980 return, petitioner reported $211.46 as income from "mining production." Petitioner's 1981 return contained no reference to the Venus project.

While the Venus project originally was situated on the Peter B#1 claim, the project was transferred to a new site, the Pyramid claim, located in Sierra County, NM, in May 1978, after Mr. Van Zyl determined that the Peter B#1 claim was not capable of producing commercially minable bodies of ore. Prior to acquisition of the Pyramid claim, Mike Whyte, president of Rift Exploration & Drilling, Inc., examined the property. Mr. Van Zyl also examined the property. Eventually, after some studies and drilling, it was determined that the Pyramid claim should be abandoned, and in May 1980, the Venus project was transferred to the Great Republic claim, located in Sierra County, NM. The Great Republic claim was an old mine, and there were geology reports in existence at the time the property was acquired by the Venus project. Capitan Resources, Inc., was in charge of mining the Great Republic. When the Venus project acquired the Great Republic, the mine was full of water. In 1982, it was determined that ore obtainable from the Great Republic would be limited in both quality and quantity and that further activity on the property was unwarranted. Accordingly, Resources purportedly transferred the Venus project to gold properties in Montana.

During the years 1977 through 1982, Resources, USMM, or Minerex corresponded with investors, usually by means of a quarterly progress report. In general, quarterly reports discussing progress with respect to each claim fell into a typical pattern. The first report would discuss the acquisition of a new and promising claim. This report would be followed by reports describing work progress, occasionally mining results, and most often, delays in work progress. Eventually, a report would be sent admitting the poor potential of the mining claim in question and announcing the acquisition of a new and promising claim. The letters and reports often contained recommendations or information regarding tax issues. For example, by letter dated May 22, 1978, USMM advised investors that it might be in their best interests to forgo

mining in 1978 so as to receive another tax loss. In addition, investors were advised that the Internal Revenue Service had been auditing the Venus project "as well as all other tax shelters in the United States"; that investors could expect to be audited if they had not already been; that under no circumstances were investors to sign a Form 872A granting an extension of the audit period; and that if audited, investors immediately should file a power of attorney so that Resources' tax attorney could defend deductions.

Although Resources, USMM, or Minerex complied with all filing requirements imposed by the State of New Mexico with respect to mining claims, none of those entities filed mining claims in the Santa Fe Office of the Bureau of Land Management until 1980. Moreover, the recordation of the Peter B#1 claim in the Socorro County clerk's office did not coincide with the location of the claim indicated in the Venus project offering memorandum. In addition, it is reasonably apparent that the project never erected any boundary markers or monuments on the Peter B#1 claim.

During the years 1978 through 1980, no ore containing economically recoverable amounts of gold or silver was mined from the Peter B#1, Pyramid, or Great Republic claim.

Resources is unable to provide any of the following records:

(a) Any documents showing that gold or other minerals in commercially marketable quantities have been discovered on the Venus mining properties (including the substitute properties).

(b) Any written plans and/or resulting documentary data pertaining to drill hole studies on the Peter B#1 claim.

(c) Any smelter settlement sheets or any other evidence of ore that was derived from the Venus project claims being processed at a smelter.

(d) Any density test results (with related maps), showing the location of bulk samples on which the test was based, for any of the Venus project claims.

(e) Any proofs of labor for the Great Republic claim.

(f) Any detailed operating cost estimates and calculations including, but not limited to, metallurgical flow sheets, mining equipment lists, hourly operating costs, proposed mining procedures, prevailing labor rates, and personnel requirements for the Peter B#1 claim.

(g) Any original survey notes of underground workings and/or surveys locating the surface drill sites for the Great Republic mine.

(h) Any records showing actual original drilling cores resulting from the core drilling operations at the Great Republic mine.

(i) Any billings sent to investors in the Venus project for exploration and/or mining expenses at the various Venus project claims.

(j) Any records showing payments made by petitioners or other investors in the Venus project for exploration and/or mining expenses at the various Venus project claims.

In a notice of deficiency dated April 3, 1981, respondent, on a number of different grounds, disallowed the $31,250 losses claimed by petitioner on his 1977 Schedule C and his 1978 Schedule C.

In preparation for the trial herein, respondent engaged Dr. Charles E. Chapin, a highly recognized expert in the field of geology, and Mr. J.W. Fulmer, an expert in the field of mining engineering, to examine the various mining claims used in the various mining projects offered by Resources during the years in question and to prepare detailed written reports with respect to their findings and conclusions.

## General Overview of Mining Industry Practice

In general, there are several stages involved in creating a profitable mining activity. These stages include (1) discovery, (2) exploration, (3) development, and (4) production. A "discovery" of mineral is the foundation upon which the entire mining law is based. It is the inception of title and an indispensable requisite to the validity of a mining claim. The discovery need not be of commercial ore but should be of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine. A complete "exploration" sequence, itself, can be broken down into a number of separate stages. Progression through the different stages is typically accompanied by a reduction in the size of areas considered favorable for mining. The first stage is in the nature of a general reconnaissance of relatively large regions to select areas favorable to the occurrence of

mineralization. During the reconnaissance stage, the prospective miner will generally map the area and perhaps do some sampling. The second stage of exploration involves more detailed mapping and more extensive sampling. During the third stage of exploration, target areas are investigated in detail, first on the surface, and then, if warranted, by three-dimensional physical sampling. The "development" stage is reached when deposits of ore or other minerals are found to exist in sufficient quantity and quality reasonably to justify exploitation. The "production" stage, of course, involves the actual extraction of the ore or other minerals.

"Ore," as that word typically is defined in the mining industry, is something that can be mined and sold at a profit. "Reserves" is an engineering term. The calculation of gold or silver reserves generally involves taking measurements of length, width, and depth in an effort to determine the volume of rock and the measurement of its density, which, in turn, is converted from cubic feet to tons. The calculation also involves assaying numerous samples in an effort to determine the quantity of gold or silver in the volume of rock. "Measured" or "proved" ore is ore for which tonnage is computed from dimensions revealed in outcrops, trenches, workings, and drill holes and from which the grade is determined from the results of detailed samplings. The sites for inspection, sampling, and measurement are so closely spaced and the geological character is so well defined that size, shape, and mineral content are well established. "Indicated" or "probable" ore is ore for which tonnage and grade are computed partly from specific measurements and samples of production data, and partly from projection for a reasonable distance on geological evidence. "Inferred" ore is ore for which quantitative estimates are based largely on a broad knowledge of the geological character of the deposit and for which there are few, if any, samples or measurements. Estimates for inferred ore are generally based on a comparison of deposits of similar character. Because specific grades of mineral content cannot be credited to inferred ores, inferred ore cannot be used in the direct evaluation of a mineral deposit.

Generally, the locator of a mining claim must comply with a number of Federal and State recordation requirements in order to protect his claim. The locator must perform location

work on each claim in an attempt to show mineral in place (discovery) within a specified number of days of location. The mining claim and location work performed must be recorded not only in the county in which the claim is located but also with the Bureau of Land Management State Office. A yearly affidavit of assessment work must be filed in the county recorder's office and in the Bureau of Land Management State Office. Failure to file a notice of location or an affidavit of assessment work constitutes abandonment of the mining claim and renders the claim legally void. In addition to recordation requirements, the locator of a mining claim in New Mexico is generally required by both Federal and State law to erect some sort of substantial posts or monuments so that the boundaries of the claim can be readily traced.[5]

## OPINION

Respondent makes several alternative arguments supporting his disallowance of the loss deductions claimed by petitioner. He argues that, because of the failure to comply with Federal recordation requirements, petitioner had no proprietary or economic interest in the mining claims from which he could legally pay any royalties to Resources. He also argues that the claimed "advanced royalties" do not meet the definition of minimum royalties as set forth in section 1.612–3(b)(3), Income Tax Regs., and that no true debtor-creditor relationship existed between petitioner and Resources, since payment of the nonrecourse notes was highly contingent. In addition, he argues that petitioner's purported liability under the nonrecourse notes does not meet the tax accounting requirements for deductibility as set forth in sections 446 and 461. Respondent's primary argument, however, is that the Venus project is a classic example of an abusive tax shelter, which petitioner engaged in not for profit, but solely in order to achieve large, hoped-for deductions, far exceeding his cash contributions. We choose to begin by addressing respondent's profit-motive argument.

---

[5]The foregoing is not intended to be a definitive or comprehensive discussion of mining industry practice. It is simply intended to provide the reader with a very broad and generalized overview of certain limited aspects of typical mining practice.

Royalties traditionally have been described as akin to rent and are deductible by the payor as a trade or business expense under section 162(a)(3). *Commissioner v. Jamison Coal & Coke Co.*, 67 F.2d 342, 344 (3d Cir. 1933); *Burnet v. Hutchinson Coal Co.*, 64 F.2d 275, 278 (4th Cir. 1933); *Surloff v. Commissioner*, 81 T.C. 210, 232 (1983). The carrying on of a trade or business is, of course, a prerequisite to deductibility under section 162(a). Thus, absent a trade or business, petitioner herein is not entitled to deduct the purported "advanced minimum royalties."

The standard for determining whether an individual or a partnership is carrying on a trade or business so that expenses are deductible under section 162 is whether the individual or partnership is engaged in the activity with the predominant purpose and intention of making a profit. *Brannen v. Commissioner*, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; *Surloff v. Commissioner, supra* at 232; *Flowers v. Commissioner*, 80 T.C. 914, 931 (1983); *Allen v. Commissioner*, 72 T.C. 28, 33 (1979). "Profit" in this context means economic profit, independent of tax savings. *Surloff v. Commissioner, supra* at 233. While a reasonable expectation is not required, the profit objective must be bona fide. Sec. 1.183–2(a), Income Tax Regs.; *Fox v. Commissioner*, 80 T.C. 972, 1006 (1983), affd. by order (2d Cir., Jan. 23, 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. *Kratsa v. Commissioner, Hook v. Commissioner, Rosenblatt v. Commissioner, Leffel v. Commissioner*, and *Zemel v. Commissioner*, 734 F.2d 5, 6–7, 9 (3d Cir. 1984). The determination of whether the requisite intention exists is one of fact to be resolved on the basis of all the facts and circumstances. *Flowers v. Commissioner, supra* at 931–932; *Dunn v. Commissioner*, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980).[6] The burden of proving the existence of the requisite

---

[6]Some of the relevant factors to be considered in determining whether an activity is engaged in for profit are (1) the manner in which the taxpayer carried on the activities; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of the occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183–2(b), Income Tax Regs.

intention rests with petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure; *Golanty v. Commissioner*, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

In cases involving partnership activities, we have held that the profit motive analysis should be made at the partnership level. *Brannen v. Commissioner*, 78 T.C. at 505; *Siegel v. Commissioner*, 78 T.C. 659, 698 (1982). We have left open the question of whether profit objective should be determined at the partner level, rather than the partnership level, where a section 761(a) election is made to be excluded from the application of the provisions of subchapter K. *Rosenfeld v. Commissioner*, 82 T.C. 105, 113 n. 13 (1984); *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 559 n. 9 (1979), affd. 633 F.2d 512 (7th Cir. 1980).

In the instant case, the Venus project made a section 761(a) election. The parties have not clearly articulated their respective views on whether we should focus our profit-motive inquiry on the Venus project as an entity or on the individual investors. Petitioner appears to suggest that we should focus on the motivation of the individual investors, when he states on brief that petitioners relied on representations made by Resources that sufficient income would be generated so that petitioners would receive a significant economic return on their investments. Respondent, on the other hand, appears to suggest that we focus on both the entity and the individual investors. Respondent states that the effect of a section 761(a) election is that the partner has divided his activity into two parts—both a joint activity and an individual activity. Therefore, according to respondent, "although the entity level is paramount for determining profit motive as to the joint activity, the individual level must be examined for profit motive even if [the] taxpayer can prove that the joint activity was entered into for profit."

The instant case does not present the proper setting in which to resolve the question of what effect a section 761(a) election properly should have on the profit-motive analysis. Resolution of the issue would not affect the ultimate disposition of this case, since we conclude that petitioner has woefully failed to establish the requisite profit intention, irrespective of

the level at which profit motive should be tested in this case.[7]

We note that neither petitioner nor any of the other investors in Resources' investment projects testified in the trial of this case. Petitioner's sole witness was Mr. Van Zyl, who acted as promoter of the Resources' investment projects. Under these circumstances, to the extent petitioner would have us test profit motive at the individual investor level without reference to the collective activities of the investment projects, we are somewhat mystified by the posture he has taken in litigation. At most, in this case, we can only infer individual investor motive by examining the activities of the Venus project in general. Having examined those activities, we are left with the overwhelming impression, and so conclude, that the Venus project, as well as the other projects involved in this consolidated case, were abusive tax shelters designed with a primary view to achieving substantial tax benefits and carried out with a complete indifference to economic profit.

Respondent contends that the method by which the offering memoranda were prepared is indicative, itself, of the lack of any bona fide economic profit motive. The evidence presented amply supports respondent's position that preparation of the various memoranda was simply a "cut-and-paste" exercise in marketing tax shelters. Ms. Potter, Resources' secretary, testified that she typed one or two original offering memoranda and then used those to type offering memoranda for other projects, changing pertinent data such as names, dates, places, and figures, to reflect the different mining claims. The cut-and-paste method used to prepare documents pertaining to Resources' various projects perhaps can best be illustrated by reference to four separate documents relating to different mining claims used in the projects.[8] The documents contain identical geology reports, all signed by Mr. Carlson. Mr. Carlson, however, testified that he prepared only the one written geology report on the Peter B#1 claim. The documents also contain identical assay reports and, with one minor exception, perhaps due to a typographical error, identical

---

[7]Similarly, we need not express any opinion with respect to whether the Venus project was in fact a "partnership" as defined in sec. 761 and eligible to make a valid sec. 761(a) election.

[8]The documents are entitled "Athens Mining Claim," "Gregory Mining Claim," "Peter B Mining Claim," and "Venus Mining Claim."

calculations of reserves pages. It is inconceivable to us that bona fide geology, assay, and reserve reports on different mining claims would yield identical results. The only plausible explanation is that the documents resulted from the cut-and-paste mass marketing technique used by Resources, a technique that was carried out from start to finish with a total disregard of the truth and without any real attempt to determine the economic realities of the mining projects.

Resources' disregard for the truth is also illustrated by the incorrect and misleading titles attributed to the geology report (Registered Geologists Report) and assay report (Official New Mexico Bureau of Mines Assay Report) included in the offering memorandum. These titles were added to the reports by Resources, and it is relatively clear that even a minimal amount of investigation would have informed Resources that the addition of the words "Registered" and "Official" were false and inappropriate. Moreover, we do not believe that the errors were the result of honest mistakes as opposed to deliberate mislabeling, since errors of this type were made on more than one occasion. The Boss project offering memorandum also included a "Registered Geologists Report," which was prepared by Mr. Antonio Dalla Vista, a mining engineer and geologist. At trial, Mr. Dalla Vista testified that he was not a registered geologist and never represented himself as such.

The circumstances surrounding the preparation and use of the above-mentioned geology reports also cast serious doubts on Resources' attempts to determine the economic realities of the properties in question. Mr. Carlson's report was written in response to a request to do a "quick job of sampling" the Peter B#1 claim and to write a "brief report" on his findings. Mr. Carlson apparently was not even made aware of the intended use of the report. Similarly, Mr. Dalla Vista testified that he was requested, on behalf of Mr. Patulea of USMM, to inspect certain mining properties and to prepare a report on his findings, and that he was not made aware of Resources' interest in the report. He further testified that at Mr. Patulea's insistence, he prepared his geology report without waiting for assay results, although it was not customary to do so. After submission of his report, Mr. Dalla Vista was asked on behalf of Mr. Van Zyl to rephrase parts of the report to

make it more attractive; however, according to Mr. Dalla Vista, he refused to do so. At trial, Mr. Dalla Vista pointed out certain discrepancies between his original report and the report contained in the Boss offering memorandum.

The calculation of reserves provides yet another example of what, at best, may be described as a lack of due diligence in preparing the Venus offering memorandum. Mr. Van Zyl testified that the calculation was based on Mr. Carlson's geology report and the assay report. Therefore, since Mr. Carlson's report was based on a more or less cursory examination of the property and the assay report was prepared on the basis of only two samples, the calculation of reserves certainly was not based on detailed measurements and assays of numerous samples, as is typically involved in the calculation of reserves.

Even Mr. Carlson admitted at trial that he would have approached his task differently had he known his report was to be utilized in preparing reserve calculations. He admitted that substantial additional work would have been necessary before Resources could have gotten an accurate picture of the reserves. Similarly, when asked whether he could have prepared reserve calculations based on his geology report on the Boss project, Mr. Dalla Vista responded that he could not have done so, because "there wasn't enough information to do anything, either the grades or the dimensions of the ore, if there was any ore, assuming there was any ore."

Moreover, respondent's experts called into serious question the substantive correctness of Mr. Carlson's geology report and the assay report on which the calculation of reserves on the Peter B#1 claim was based.

Dr. Chapin concluded in his written report, and so testified at trial, that the geology report was not prepared by a competent geologist and that the assay report and reserve calculations were both fraudulent and prepared by persons with very limited knowledge of mining, metallurgy, or assaying. According to Dr. Chapin, the geology report contained many glaring errors relating to the nature of the rocks on the surface of the property and the estimated depth of any mineralization. In fact, according to Dr. Chapin, he had only to walk over the surface of the Peter B#1 claim to determine that the property was worthless for mining purposes.

With respect to the assay report, Dr. Chapin stated that it also contained glaring errors, aside from the fact that it was not an official report as entitled, and that whoever typed it was practicing a poor job of deception. Dr. Chapin found it strange that the value assigned to silver in one of the samples was carried to two decimal points, whereas that assigned to gold was carried to only one decimal point. According to Dr. Chapin, normal practice dictates to the contrary since gold is much more valuable than silver. He found it even stranger that gold and silver were represented as being in about the same abundance in one sample, stating that silver is usually several times more abundant than gold. Furthermore, he found the silicate analysis in the assay report defective in that it failed to list several major oxides that are essential parts of a silicate analysis and did list a major oxide that is never included in a silicate analysis.

With respect to the calculation of reserves, Dr. Chapin concluded that the calculation took into account certain patently absurd assumptions and that the assumed 20-percent recovery for gold and silver was "ridiculously low." According to Dr. Chapin, recoveries for these metals typically run from about 60 percent to 90 percent. In Dr. Chapin's words, "If you have an ore body of the magnitude that is claimed here [in the calculation of reserves], and you were satisfied with only 20 percent of the recovery of the gold and silver in it, you'd be a fool."

Mr. Fulmer reiterated many of the points made by Dr. Chapin with respect to the glaring substantive errors contained in the offering memorandum. He agreed with Dr. Chapin that one need only walk over the property to determine that it should be rejected. To assist the Court in understanding the magnitude of those errors, Mr. Fulmer compared the ore reserves claimed by Resources with the total recorded production of gold and silver in the Magdalena Mining District and the total recorded production of gold in the entire State of New Mexico. The following quote from Mr. Fulmer's written report puts the numbers in telling perspective:

The ore reserves for both claims [the Peter B #1 and the nearby Gregory 4] are said to be identical, a geological impossibility. Then, in complete disregard for the economic impact of variations in topography, haulage

distances and grades and other factors, the cash flows and "cumulative cash gains" predicted from the exploitation of the two claims are identical also.

The following may provide some measure of perspective:

Total Magdalena District production of gold from 1904 through 1954 amounted to 2883 ounces, while silver production for the same period was 1,456,765 ounces * * *. Although the extent of District mineral production subsequent to 1954 is not known, an extrapolation, based on average annual yields and on the unrealistic assumption of continuous production from 1954 to 1982, indicates that total precious metal production has probably been less than 5000 ounces of gold and 2,300,000 ounces of silver. All such production would have been derived from a geological environment radically different from that prevailing in the subject area. Yet Resources America claims to have total reserves of 2,880,000 ounces of gold and 2,925,000 ounces of silver confined to an area equivalent to that of a single claim and to a depth of only ten feet. This is a bonanza of unusual proportions with a gold reserve exceeding the total recorded New Mexico production through 1954 of 2,644,839 ounces * * *. It is unthinkable that this billion-dollar surface gold-silver deposit would go undetected in over a hundred years of prospecting. [Citations and fn. ref. omitted.]

A further error in the offering memorandum involves the precise location of the Peter B#1 claim. The location plotted in the diagram contained therein differs from the location recorded in the Socorro County clerk's office. Furthermore, both Dr. Chapin and Mr. Fulmer stated that neither of the foregoing locations fits the geographical description in the offering memorandum that "Purple Andesite is found on approximately one half (0.5) of the surface area of the claim."

Without belaboring the point further, the evidence as a whole demonstrates in a most convincing manner that Resources engaged in its marketing techniques with, at best, a purposeful refusal to ascertain the truth of the matters asserted in the documents presented to investors. There is no evidence that the investors did anything other than passively accept the investment packages offered by Resources. Had the investors engaged in even a minimal amount of independent research, we entertain no doubts but that they quickly would have uncovered some of the substantive errors contained in the documents. It is thus reasonable to assume that the investors did not place high priority on the economic realities of the ventures. Rather, it was the anticipated tax benefits emphasized in the offering memorandum and the legal opinion attached thereto that motivated the investment.

Resources' operational modes in general provide further very significant evidence of a lack of bona fide economic profit motive. The type of operation carried on by Resources drastically departed from anything even remotely approaching accepted industry practice.

Resources made no attempts to progress through the various stages of discovery, exploration, development, and production. Nor does it appear that Resources did sufficient preparatory work to enable a calculation of reserves on any of the claims in question. In this connection, Dr. Chapin testified as follows (questions by respondent, answers by Dr. Chapin):

Q. * * * Using your steps, discovery, then exploration, had any of those claims gotten beyond the discovery stage?

A. Which were the claims again?

Q. The Peter B-1, Pyramid and Great Republic claims.

A. Well, there is a great deal of difference between those claims, because Great Republic was an old mine. And, certainly, at one point, it had gone clear through the production stage.

The Peter B-1, in my opinion, there never was a valid discovery made, and certainly was no evidence of any follow-up exploratory work.

The Pyramid claim, there was a valid discovery in that there was mineralization exposed to the surface. But, there was very little exploratory work done.

As I recall, there were about 6 shallow percussion drill holes that were drilled, only 4 of which were shown in the geologist's report.

Out of those 4, only 2 contained any mineralizations and one of those 2 only had one thin mineralized zone.

So, I would have to say that on the Pyramid claim, the sequence of steps had never gone beyond the reconnaissance stage of exploration.

Q. On any of the three claims, were there inferred ore reseves? * * *

A. There were no reserves of any sort on the Peter B-1. Not even mineralization in my opinion.

On the Pyramid claim, there are insufficient measurements, either of dimensions or of assays, to calculate reserves.

*       *       *       *       *       *       *

On the Great Republic, there is an old mine there, but it has not been sampled adequately to come up with the data needed for dimensions and grade to calculate reserves. The few assay values I have seen are of material that is too low grade to constitute ore.

So, I would have to say that there are not reserves on any of these properties.

Similarly, Mr. Fulmer concluded in one of his written reports as follows:

Evidence of mineralization was found to be minimal or entirely absent, and it was apparent that no systematic exploration program had been employed to evaluate mineral potential in any of the three claim groups. It can be stated categorically that, in no instance, do "proven" ore reserves exist. Moreover, the validity of the Venus claim locations is suspect.

Mr. Fulmer further concluded that for a project of the magnitude of the Peter B#1, "core drilling on 100-foot centers * * * would probably be the minimum. This would result in around 350 assays." Resources, on the other hand, "did no drilling, trenching or bulk sampling but evaluated the entire deposit on the basis of a single assay," which itself "is suspect."

Even Mr. Carlson allowed that he would want considerably more information than was contained in his geology report before he would advise beginning operations on the Peter B#1 claim. Moreover, Mr. Dalla Vista stated that in no way could one reasonably conclude, based on his geology report on the Boss project's claim, that there were proven, probable, or even inferred reserves.

For some unexplained reason, Resources apparently attempted to skip completely any valid discovery or exploration stage, graduating directly to the development or production stage. At trial, Mr. Van Zyl stated that "In 1978, we undertook to begin production, development and production of the Venus mine, and in January or in February, I don't recall which, I personally examined the property and took samples from the property from various locations on it." Mr. Van Zyl further stated that he had seen the property briefly for the first time in December 1977. Although Mr. Van Zyl was the moving force behind Resources, USMM, and Minerex, he testified that he had no personal knowledge of the exploratory work done on behalf of Resources by its employees at the Peter B#1 claim, nor could he provide the Court with a specific breakdown of the mining costs expended on the Peter B#1 claim.

Resources also departed from acceptable industry practice by failing to comply with the applicable Federal recordation requirements. Even assuming that failure to comply with those recordation standards may have been due to mere ignorance, there is no evidence that any attempt was made to become familiar with the applicable Federal recordation laws. Such cavalier neglect of duties essential to the protection of

one's interest in a mining claim is inconsistent with a bona fide profit objective.

The apparent failure of Resources to maintain adequate, if any, books, records, and documents provides yet another illustration of the nonbusinesslike manner in which it carried on operations. The parties have stipulated that a number of very important documents are unavailable, including for example, any documents showing detailed operating cost estimates and calculations; any billings sent to investors in the Venus project for exploration or mining expenses at the various mining claims; and any documents reflecting payments made by petitioner or other investors in the Venus project for exploration or mining expenses incurred at the various mining claims. The absence of such documents is particularly curious in light of the fact that the "Operating Agreement" executed by investors specifically stated that the investors were to bear all costs and liabilities incurred in the exploitation and development of the mining claims.

We are not persuaded by petitioner's contention that Resources, through personnel with expertise in mining, continuously engaged in mining the claims on behalf of the investors. Mr. Van Zyl testified that the cash portion of the "royalty payments" received from the Venus project approximated $360,000 and that Resources had spent substantially in excess of that amount on mining operations. He explained that investors had not been billed for development and mining expenses because Resources "would have deducted the development costs from the revenues from the mine." We find this explanation patently weak and believe that it casts doubt on the level of expenditures made to develop the mining claims. Nothing in the "Operating Agreement" purports to make payment of exploitation and development expenses contingent on revenues from the mines. Furthermore, during the years 1977 through 1980, no ore containing economically recoverable amounts of gold or silver was mined from the Peter B#1, Pyramid, or Great Republic claim. It is difficult, indeed, to believe that Resources would continue to make substantial operating expenditures without being legally obligated to do so and without a concomitant inflow of revenue.

In short, the record simply does not lend itself to a finding of substantial mining activities, let alone to a finding that those

activities were conducted by qualified personnel. The record is far more susceptible to the interpretation that whatever activities were conducted were intended to give some semblance of economic substance to a venture whose promoter and participants fully anticipated eventually to find themselves before this Court. Similarly, we reject petitioner's attempt to show a bona fide operation by placing heavy reliance on the fact that Resources, USMM, or Minerex sent quarterly progress reports to investors. Again, we believe that the quarterly reports represented mere window dressing, an attempt to build the record, if you will.

The use of the large nonrecourse notes, under the facts of this case, is another indication of the lack of a bona fide profit objective. We have indicated in our prior cases that the existence of large nonrecourse notes in circumstances where it is unlikely that the notes will be paid is itself an indication that the primary objective of an activity is to generate tax deductions rather than to earn an economic profit. *Baron v. Commissioner*, 83 T.C. 542, 556 (1984); *Surloff v. Commissioner*, 81 T.C. 210, 237–238 (1983); *Flowers v. Commissioner*, 80 T.C. 914, 937 (1983).

In the instant case, Mr. Van Zyl admitted that the determination of the amount of advanced royalties that investors would be required to "pay" was based on tax considerations, specifically, on achieving multiple tax writeoffs. It is reasonably apparent that the Peter B#1 claim essentially was worthless as a mining claim. Thus, the principal amount of the nonrecourse notes given as "payment" for advance royalties greatly exceeded the fair market value of the leasehold interests in the Peter B#1 claim. That fact, alone, raises serious questions about the motives of the parties. Petitioner appears to contend that the discrepancy between the actual value of the Peter B#1 claim and its value as contemplated at the inception of the Venus project was due to an honest mistake and that the parties believed that the value of the claim exceeded the face amount of the notes. While it well may be that naivete played a role in the overvaluation of the property, "At some point, naivete becomes a purposeful refusal to analyse the facts, perhaps due to the expectation that the tax benefits, alone, will justify the investment." *Flowers v. Commissioner, supra* at 940. We entertain no doubts

but that Resources and the investors easily could have ascertained from the outset the dismal prospects of the Peter B#1 claim had they done even a minimal amount of homework. Their failure to do so suggests that the expectation of tax benefits, alone, was the primary motivating consideration in structuring and entering into the transaction.

In addition, there is substantial doubt that the venture could have proven economically profitable even assuming that the Peter B#1 claim had contained minable gold and silver approximately equal to the amounts specified in the offering memorandum. In this connection, Mr. Fulmer prepared a detailed capital and operating costs analysis, using, to the extent possible, information contained in the offering memorandum and excluding preliminary exploration costs. He concluded, based on his calculations that, assuming a 90-percent precious metal recovery, the Peter B#1 claim would have had to have had a precious metal content of approximately $108 per ton in order for investors to break even. Using Resources' 20-percent recovery figure, the Peter B#1 claim would have had to have had a precious metal content of approximately $485 per ton, as compared with the $110 value per ton estimated in the offering memorandum, in order for investors to break even.

We must conclude, based on the totality of the facts, that the nonrecourse notes used to "pay" the advance royalties had no economic substance and were used solely to accelerate and inflate the deductions of investors.

Finally, there is no evidence that any of the other investment projects ever resulted in anything other than large losses. Furthermore, there is no evidence that any of the investors ever actually made payments on the notes.

In summary, the promised tax benefits, and not the prospect of economic profit, was the allure to the transaction, which itself was entered into and carried out with a complete indifference to profit. Having concluded that the venture was not entered into with the requisite profit objective, we need

not consider respondent's alternative grounds for disallowance of the deductions.[9]

> *Decisions will be entered for the respondent in docket Nos. 8818–81, 20883–81, 21664–81, 23213–81, 25549–81, 27339–81, 28096–81, 30823–81, 5770–82, 8063–82, 9093–82, 10734–82, 10922–82, 10976–82, 11320–82, 14327–82, and 28410–82.*
>
> *An appropriate order will be entered in docket No. 31172–81.*
>
> *Decisions will be entered under Rule 155 in docket Nos. 3178–82 and 19514–82.*

---

[9]Since the Venus project generated no income in the years in question, sec. 183(b)(2) is not applicable.