RONALD Z. KRIVITSKY AND SHIRLEY A. KRIVITSKY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Krivitsky v. Commissioner
Docket Nos. 26530-84; 3451-85; 7461-85; 37996-85.
United States Tax Court
T.C. Memo 1987-460; 1987 Tax Ct. Memo LEXIS 456; 54 T.C.M. (CCH) 493; T.C.M. (RIA) 87460; September 14, 1987. *456 Petitioners deducted losses attributable to their investments in gold and silver mining programs sponsored by Resources America, Inc. The losses purportedly represented royalty expenses and mining development or exploration expenses, which petitioners paid in the form of cash and nonrecourse notes. Held, the activities giving rise to the claimed losses were not engaged in with the predominant purpose and intention of making a profit. Ramsay v. Commissioner,83 T.C. 793 (1984), followed. Consequently, the losses are not deductible under secs. 162(a), 616(a), or 617(a), I.R.C. 1954. Held further, the underpayments of taxes in these cases were substantial underpayments attributable to tax motivated transactions within the meaning of sec. 6621(c), as redesignated by the Tax Reform Act of 1986, and petitioners are therefore liable for additional interest under that section. Held further, petitioners' positions in these cases are frivolous and groundless, and they instituted and maintained these proceedings primarily for delay. Consequently, petitioners are liable for damages under sec. 6673, I.R.C. 1954. Harry Winderman, for the petitioners. Avery Cousins, III, for the respondent. *457 STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket No.
Petitioner
Year
Deficiency
26530-84
Ronald Z. Krivitsky
1980
$ 6,605.12
and Shirley A. Krivitsky
3451-85
Hugh S. Dewitt and
1980
13,725.00
Imelda W. Dewitt
7461-85
Welton E. Firehammer and
1980
14,459.00
Marilyn M. Firehammer
37996-85
Fred W. Gahr and
1982
13,198.00
Barbara Gahr
The deficiencies result from respondent's determination that petitioners are not entitled to deduct losses attributable to investments by petitioners in gold and silver mining programs sponsored by Resources America, Inc. The mining programs at issue in these consolidated test cases are successors to programs previously issued by Resources America, Inc., some of which were considered by this Court in Ramsay v. Commissioner,83 T.C. 793 (1984). We must decide (1) whether petitioners are entitled to deduct their claimed losses from the mining programs in question; (2) whether petitioners' underpayments of taxes, if any, are substantial underpayments attributable to tax motivated transactions within the meaning of section 6621(c); [2] and (3) whether petitioners are liable *458 for damages pursuant to section 6673. FINDINGS OF FACT [3]
Some of the facts have been stipulated and are so found. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference. At the time their respective petitions were filed herein, petitioners Ronald Z. Krivitsky and Shirley A. Krivitsky were husband and wife and resided in Ellsworth, Pennsylvania; petitioners Hugh S. Dewitt and Imelda W. Dewitt were husband and wife and resided in Dallas, Texas; petitioners Welton E. Firehammer and Marilyn M. Firehammer were husband *459 and wife and resided in Clearwater, Florida; and petitioners Fred W. Gahr and Barbara Gahr were husband and wife and resided in Orlando, Florida. Petitioners Ronald Z. Krivitsky and Shirley A. Krivitsky filed their joint Federal income tax return for the year in question with the Office of the Internal Revenue Service in Philadelphia, Pennsylvania; petitioners Hugh S. Dewitt and Imelda W. Dewitt filed their joint Federal income tax return for the year in question with the Office of the Internal Revenue Service in Austin, Texas; petitioners Welton E. Firehammer and Marilyn M. Firehammer filed their joint Federal income tax return for the year in question with the Office of the Internal Revenue Service in Chamblee, Georgia; and petitioners Fred W. Gahr and Barbara Gahr filed their joint Federal income tax return for the year in question with the Office of the Internal Revenue Service in Chamblee, Georgia. Overview of the Mining Investment Programs
In 1980 and 1982, Resources America, Inc. (Resources), sponsored and offered to investors a number of gold and silver mining investment programs, including the Bender Gold Program, the Silver Tombstone II Program, the Grubstake Gold Program, *460 and the Madison Gold Program (hereinafter sometimes collectively referred to as the programs). [4] The purported purpose of these programs was to explore and develop mining claims allegedly owned or leased by Resources. Resources participated in each program by leasing or subleasing fractional, undivided interests in the mining claims to investors such as petitioners. Resources also acted as the operating manager of each program and, as such, was authorized to conduct the day-to-day activities of the programs and supervise the activities of the contract miner. Minerex, Inc. (Minerex), a corporation wholly owned by Bernard Van Zyl, the president and owner of Resources, acted as the contract miner for each program and was responsible for developing and mining the programs' properties. [5]
Investment units in the *461 programs were offered to potential investors, including petitioners, by means of private offering circulars. Each of these circulars contained, inter alia, a description of the mining claims to be developed by a program, a summary of the terms of the program, and a general discussion of the economic risks and tax consequences of participating in the program. Each circular also contained cash flow schedules, a legal opinion, a "Lease Agreement," [6] a "Joint Operating Agreement," a "Development and Production Services Agreement," and a "Non-Negotiable Recourse Promissory Note." [7]
The legal opinion included in each offering circular was prepared by Harry Winderman, an attorney from Boca Raton, Florida, and dealt exclusively with potential tax consequences to investors. With respect to the tax benefits promised to investors, each circular expressly represented *462 that Resources would, "at its own expense, * * * defend disallowance of the participants' tax deduction resulting from Internal Revenue Service audit," and that the "participants' tax position * * * [would] be defended through the Tax Court level." The "Lease Agreement" contained in each of the offering circulars provided, in pertinent part, as follows: 1. Grant of Lease. In consideration of the rents and royalties herein reserved and to be paid by Lessee to Lessor [Resources] as herein provided and of the terms, conditions and covenants herein contained, Lessor does hereby demise and lease unto Lessee a fractional undivided interest in the sole and exclusive purpose of mining and removing any and all minerals located on the Property by whatever methods of mining Lessee deems appropriate * * *. * * * 4. Initial Term. This Lease shall be for an initial term of three lease years * * *. 5. Renewal Term. If at the end of the initial term of this Lease Lessee shall not be in default under the terms hereof in any respect whatsoever, then this Lessee shall be automatically renewed for an additional period of one year. Likewise, if at the end of said renewal period Lessee shall not *463 then be in default under the terms hereof in any respect whatsoever, then this Lease shall be automatically renewed for an additional period of one year or until all mineable and merchantable minerals have been removed. Any such renewal shall be subject to all of the terms and provisions hereof. Notwithstanding anything herein to the contrary this Lease shall be automatically terminated by the exhaustion of the minerals prior to the end of such term or renewal term. 6. Annual Minimum Royalty.
a. For each of the first three lease years, Lessor shall be entitled to receive an annual minimum royalty of * * * [$ 2,800 for each unit leased in the Bender program; $ 7,429 for each unit leased in the Silver Tombstone II program; $ 7,429 for each unit leased in the Grubstake program; and $ 1,000 for each unit leased in the Madison program]. For the first lease year, this royalty shall be paid through a cash payment of * * * [an amount equal to the annual minimum royalty for the program]. b. For the remaining years, Lessor shall receive an annual minimum royalty in the same amount as aforesaid, but said royalty shall be due and payable only as gross receipts from the mining and sale *464 of minerals from the property are received. * * * 10. Default by Lessee. In the event Lessee fails to make the royalty payments to Lessor as herein provided and remains in default thereof for a period of more than one month after written notice of such default, this Lease shall terminate at the option of Lessor. * * * * * * 13. Security Interest. To secure the payment of the royalties due Lessor under this Lease, Lessee hereby grants a security interest to Lessor, in and to the following collateral: a. The property demised herein. b. All improvements, structures, buildings, equipment, machinery and other personal property of Lessee used in connection with the mining operations on the demised property. c. All proceeds of any of the foregoing personal property, including without limitation insurance proceeds from any loss or damage to the foregoing personal property. [8] The "Non-Negotiable Recourse Promissory Note" contained in each of the offering circulars *465 provided, in pertinent part, as follows: FOR VALUE RECEIVED, the undersigned promises to pay to Minerex, Inc. (the "Payee") the principal sum of    Dollars ( $    ) together with interest on the unpaid balance (computed at 6% per annum) at 228 Park Avenue North, Winter Park, Florida, or at such place as the Payee may designate in writing, on or before December 31, 1991. All payments on the account of the indebtedness represented by this note shall be applied first to accrued and unpaid interest and then in reduction of principal. This note may be prepaid at any time. This note is issued by the Maker to the Payee pursuant to the terms of a certain Development and Production Services Agreement of even date between the Payee and the Maker, and represents payment in part of turn-key mine development costs. The terms of said agreement are hereby incorporated herein * * *. This note is non-negotiable, and may not be assigned, hypothecated or otherwise transferred or negotiated by the Payee. [9] *466 * * * The "Development and Production Services Agreement" contained in each of the offering circulars, and referred to in the "Non-Negotiable Recourse Promissory Note" quoted above, provided, in pertinent part, as follows: WHEREAS, the Co-owners [Investors] are desirous of obtaining the services of Minerex[10] as an independent contractor to develop the property on a turn-key basis, mine, and commercially exploit the ore and Minerex is desirous of serving as such independent contractor and assuming the obligations related thereto; NOW, THEREFORE, in consideration of the mutual promises and understandings contained herein, and intending to be legally bound, the parties hereto agree as follows: 1. Right to Mine. Provided the Contract miner [Minerex] [11] is not in default hereunder, it shall have the sole and exclusive right during *467 the term of this Agreement to develop, mine, extract and remove all mineable ore upon the terms and conditions hereinafter set forth. * * * 2. Representations and Warranties of Minerex. The Contract Miner warrants, represents and agrees as follows: (a) That it shall use its best efforts: (i) To undertake the turn-key development of the mining facilities on the property designed to exploit the maximum ore production thereof to the extent feasible under all the facts and circumstances present thereat. (ii) Throughout the term of this Agreement to mine, extract, and remove the ore in commercially marketable quantities and will deliver said ore in accordance with the provisions of this Section 2 of this Agreement; it will conduct all such development mining and extraction of the ore in a prudent and workmanlike manner with due regard to the development and preservation of the property as a valuable asset, and in accordance with the terms of the Lease, and any, and all, existing or future Federal, State and local laws, rules and regulations applicable to the property or the operations to be conducted *468 thereon. (b) That it shall: (i) Keep true and complete books, accounts, and records of its operations and development and engineering plans hereunder and permit the Co-owners, the Operating Manager, its employees or agents to inspect said books, accounts, records and development and engineering plans from time to time in the place where they are normally maintained and during normal business hours and furnish copies to the Co-owners as reasonably requested. * * * (c) Contract Miner will, at its own cost and expense, construct and maintain in good working order all facilities, including access roads, hydrological facilities, including without limitation, silt dams, ponds, reservoirs and any and all other facilities necessary to comply with federal, State and local laws, tunnels, shafts, hoists and other mining facilities, and any, and all machinery, tools and equipment necessary or desirable for the mining and extraction or removal of ore from the Property and for the delivery thereof in accordance with the provisions of this Agreement * * *. (d) To secure, at its own cost and expense, any, and all, bonds, licenses, or permits required by any federal, State or local laws, rules, *469 or regulations or ordinances, and shall, upon the execution of this Agreement, from time to time thereafter as requested by the Co-owners, provide the Co-owners with proof acceptable to it of the existence of such bonds, licenses, and permits. (e) To be responsible at its own cost and expense for "reclamation" meaning any, and all, work necessary to comply with current and prospective State and federal laws, and regulations and obligations related to reclaiming or restoration of any property or related to Leases and Mineral Deeds to surface owners, in accordance with the terms of any permits or licenses and all applicable federal, State and local laws, rules, regulations, and ordinances. * * * (g) Will deliver, at the Co-owners [sic] cost and expense, the ore that it develops and produces to the Co-owners or their designee at such place as the Co-owners may, from time to time, designate in writing. (h) To make available to the Operating Manager all information relating to the operations hereunder. * * * 3. Term. The term of this Agreement shall commence as of, [sic] the date of execution hereof and shall continue for ten (10) years or until the earlier termination of this Agreement *470 pursuant to the provisions * * * hereof * * *. 4. Payments.
(a) The Co-owners shall pay, or cause to be paid, to Contract Miner as the sole and exclusive consideration payable to Contract Miner for the services to be performed under Paragraph 2(a)(i) hereunder, the sum of * * * [$ 1,277,500 for the Bender program; $ 1,840,000 for the Silver Tombstone II program; $ 1,840,000 for the Grubstake program; and $ 1,452,000 for the Madison program] as full and complete payment for the turn-key development of the Property payable upon the execution of this Agreement in cash of * * * [$ 322,000 for the Bender program; $ 265,000 for the Silver Tombstone II program; $ 265,000 for the Grubstake program; and $ 462,000 for the Madison program [12] *471 and * * * Promissory Notes (the Notes) in the aggregate amount of * * * ] [$ 955,500 for the Bender program; $ 1,400,000 for the Silver Tombstone II program; $ 1,312,500 for the Grubstake program; and $ 990,000 for the Madison program]. The Notes shall be payable together with accrued interest on the remaining principal balance at the rate of six percent (6%) per annum on or before December 31, 1991. [13]
(b) The Co-owners shall pay, or cause to be paid, the costs of mining including subcontracting labor, overhead, administration, severance taxes, et cetera, plus a fee equal to fifteen (15%) percent of such costs. 5. Payments and Statements.
* * * It is expressly understood and agreed that in the even the Co-owners fail to make payment to Minerex as aforementioned Minerex shall not seek payment from the individual Co-owners, nor, shall it have any claim against the individual Co-owner for payment, but rather shall look only to proceeds realized from the sale of the ore to satisfy its claim for monies due and owing to it. The "Joint Operating Agreement" contained in *472 each of the offering circulars provided that Resources would serve as the "Operating Manager" or "Operator" of each program, and that it was authorized generally to conduct, oversee, and supervise the day-to-day operations of the programs. More specifically, Resources was authorized to enter into mining contracts, to act as sales agent for the disposition of mineral products, to execute and file government documents, and to perform a number of other services on behalf of the investors in the programs. The "Joint Operating Agreement" also required Resources to prepare all necessary tax returns, reports, and other filings for the programs, and to keep accurate books of account, an accurate record of the operation of each program, and an accurate record of all transactions conducted on behalf of the investors in the programs. In return for these services, the "Joint Operating Agreement" provided that Resources was entitled to receive an initial fee of $ 5,000 from the contract miner (Minerex or Ramco depending on the program) and an ongoing fee of 5 percent of the income received by the investors in the programs, minus payments for royalties and production costs. The "Joint Operating *473 Agreement" also provided that the "Operator shall be reimbursed for his reasonable out-of-pocket expenses directly incurred in the performance of his services hereunder, subject to appropriate substantiation of such expenses." With respect to the tax status of the programs, the "Joint Operating Agreement" contained the following provision: The Program hereby elects under Section 761 of the Internal Revenue Code of 1954 as amended * * * not to be subject to Subchapter K of the Code and the Participants [Investors] hereby authorize, empower and direct the Operator to cause the * * * [Program] to elect not to be subject to Subchapter K of the Code in accordance with the Treasury Regulations thereunder. Each Participant, by executing this Agreement, agrees not to take any action which would invalidate the * * * [Program's] election to exclude the * * * [Program] from the provisions of Subchapter K of the Code. During the years 1981 through 1985, Resources or Minerex corresponded with investors in the programs by means of letters and quarterly progress reports. This correspondence generally followed the same pattern. Early reports and letters would describe favorably the work performed *474 at the various properties. Later reports and letters, though still generally favorable, would describe delays and difficulties encountered in developing the properties. Eventually, a report or letter would be sent admitting the poor potential of the subject mining claim and proposing the substitution of a new and promising claim. Finally, letters would be sent appealing to investors to prepay their promissory notes "to keep the program[s] and the company [Resources] alive." The letters and reports often contained recommendations or information regarding tax issues. For example, by letter dated October 9, 1981, Resources advised investors in the Bender, Silver Tombstone II, and Grubstake programs that the Internal Revenue Service "may soon audit your 1980 program." In the same letter, Resources also stated as follows: If you are audited and the agent disallows your deduction, do not be alarmed. He is doing it with the primary objective of harassing you into immediate payment. You don't need to do this. Harry Winderman, Esq. has been engaged to represent each and every one of you before the Internal Revenue Service. The Internal Revenue Code requires that before the Internal *475 Revenue Service can send out a bill for the collection of income tax, that it must follow certain rules. * * * * * * The time it will take from the time of filing the Petition with the Tax Court, until the final resolution of these issues may take several years. Mr. Winderman has indicated to us that at present, there are thirty-five thousand cases before the United States Tax Court, which at present only has nineteen judges. On an average, the United States Tax Court only hears fifteen hundred cases a year. In addition to this current backlog, there are [sic] some two hundred thousand taxpayers under audit at the end of 1979 for tax shelter related deductions. Unless something drastic is done, it is Mr. Winderman's opinion that it will be several years before these matters will be resolved in the United States Tax Court. For so long as it takes to resolve the issue in the United States Tax Court, the Internal Revenue Service cannot demand or require payment of tax from you. * * * Standard Mining Practice
In general, a profitable mining activity progresses through several stages. These stages include exploration, development, and production. The purpose of the exploration *476 stage is to locate "ore," which is defined in the mining industry as naturally occurring material or mineralization that can be mined at a profit. The development stage is reached when ore is found to exist in sufficient quantity and quality to justify the costs necessary to prepare it for extraction. The production or mining stage involves the actual extraction of the ore. The exploration stage of a mining activity itself can be broken down into a number of stages, and the decision to pass from one stage to the next is always contingent on obtaining information from the previous stage which indicates that further effort is warranted. The exploration stage is commenced by gathering and becoming thoroughly familiar with whatever information is available concerning a region or area. The sources of such information include technical and trade publications, state and Federal mining and geological publications, private maps, graduate theses, laws and regulations, and land records. If the review of such information reveals that a region or area may be promising, the prospective miner will progress to the reconnaissance stage of exploration, during which he will map the area and perhaps *477 do some sampling. If the results of the reconnaissance stage are favorable, the prospective miner will undertake more detailed mapping and sampling, and if the results of these efforts are also favorable, the prospective miner will investigate the area in greater detail, first on the surface, and then, if warranted, by three-dimensional physical sampling. Eventually, the prospective miner will reach the stage where he will have to prepare an economic and technical study to determine whether the mineral deposits identified are in fact ore, that is, whether the deposits can be mined at a profit. Once the exploration stage has been completed and ore deposits have been located, the prospective miner will progress to the development and production stages of the mining activity. "Ore reserves" is an engineering term that refers to ore in the ground and not to material in dump sites. Ore does not constitute a "reserve" unless its tonnage has been defined by physical measurements and its grade has been defined by assaying a statistically meaningful number of samples. There are three types of ore reserves: proven, probable, and inferred (also known respectively as measured, indicated, and *478 possible). "Potential reserves" is not a term that is used or has meaning in the mining industry. "Inferred resources" also is not a term that is used or has meaning in the mining industry, although the term "resource" has been defined as hypothetical, speculative, or undiscovered mineral deposits of unknown economics. "Proven" reserves are reserves for which tonnage is computed from dimensions revealed in outcrops, trenches, workings, and drill holes and for which the grade is computed from the results of detailed sampling. The sites for inspection, sampling, and measurement are so closely spaced and the geological character is so well defined that size, shape, and mineral content are well established. "Probable" reserves are reserves for which tonnage and grade are computed partly from specific measurements, samples, or production data, and partly from projection for a reasonable distance based on geological evidence. The sites available for inspection, measurement, and sampling are too widely or otherwise inappropriately spaced to permit the mineral bodies to be outlined completely or the grade to be established throughout. Once it has been established that proven or probable *479 reserves exist, it may be possible to infer that additional reserves exist. These reserves, known as "inferred" or "possible" reserves, are reserves for which quantitative estimates are based largely on broad knowledge of the geological character of the deposit and for which there are few, if any, samples or measurements. The estimates are based on an assumed continuity or repetition, of which there is geological evidence, and this evidence may include comparison with deposits of a similar type. It is not possible to have inferred reserves, however, unless it is first established that proven or probable reserves exist. Federal mining law requires that all owners of unpatented mining claims perform at least $ 100 worth of labor on each claim each year. Where a number of adjoining claims are held in common, the total expenditure for labor that would be necessary to hold all the claims can be made on any one claim, provided the labor benefits all the claims. In addition to performing the requisite labor (also known as assessment work) on a mining claim, Federal law requires the owner of the claim to record each year with the Bureau of Land Management and the local county recorder's *480 office either evidence of annual assessment work or a notice of intent to hold the mining claim. Failure to comply with this filing requirement voids the claim. [14]
The Bender Gold Program
The mining claim assigned to the Bender Gold Program (the Bender program) was an unpatented mining claim located in Socorro County, New Mexico, approximately 80 miles south of Albuquerque, in a region known as the Mt. Baldy area of the Magdalena Mining District. For many years, the Magdalena Mining District had been the leading New Mexico zinc producer and had accounted for substantial quantities of lead as well. The production of gold in the district was insignificant, however, with only 3,859 ounces produced from 1904 through 1977. The Bender mining claim was one of 20 contiguous unpatented mining claims controlled by Resources in the Mt. Baldy area. The other 19 claims originally had been assigned to other Resources gold programs, but in 1981, these claims and their *481 programs (not including the Bender program and its mining claim) were consolidated and remarketed by Resources as the Mt. Baldy Gold Program. The block of 20 mining claims that Resources controlled in the Mt. Baldy area straddles a major geological boundary. This boundary is the margin of a volcanic basin known as a caldera. Calderas are formed by very rapid eruption of magma, which leads to the collapse of the roof of the magma chamber and the formation of a depression. The depression is then filled with sediment and volcanic rocks, and, as a result, preexiting rock formations subside and are buried to depths of several thousand feet. Most of the ore deposits in the Magdalena Mining District occur in the Kelly Limestone (a pre-volcanic formation). As a result of the caldera margin passing through Resources' Mt. Baldy claim block, the Kelly Limestone beneath the southern third of the claim block is buried and inaccessible. Consequently, the geology of the claim block north of the caldera margin is totally different from the geology of the claim block south of the margin, and work performed on the claim block north of the margin does not contribute to the exploration or development *482 of that portion of the claim block located south of the margin. In addition, information concerning the claim block north of the margin cannot be used to make projections regarding ore reserves on that portion of the claim block located south of the margin. The Bender mining claim was located south of the caldera margin. Bernard Van Zyl personally read all available Mt. Baldy geological reports and drill hole data before the Mt. Baldy and Bender programs were offered to investors. In 1978, Mr. Van Zyl received a report prepared by Peter Joralemon, a well-known and well-respected geologist, criticizing a report prepared by Michael R. Whyte on the Mt. Baldy area. In that report, Dr. Joralemon noted that Mr. Whyte was 29 years old, had graduated from college only three years earlier, and that Mr. Whyte's experience had been "entirely with coal and potash" during the brief period since he had graduated from college. Dr. Joralemon also characterized Mr. Whyte's report on the Mt. Baldy area as "entirely meaningless." Attached as Appendix A to the Bender program's private offering circular is a July 9, 1980, geological report on the Bender mining claim prepared by Michael R. Whyte. The *483 cover sheet for Appendix A indicates that this report is a "Registered Geologist' [sic] Report," but Mr. Whyte was not a registered geologist, and he never told Bernard Van Zyl that he was. Mr. Whyte asked Mr. Van Zyl for more time and money to prepare his report on the Bender mining claim, but Mr. Van Zyl rejected the request, claiming that there was not enough time or money. In the report, Mr. Whyte estimated that the North Baldy Peak area contained probable ore reserves of 4 million tons. He also stated in the report that the Bender mining claim should contain probable reserves of 90,000 tons. The Resources assay logs for the Mt. Baldy and Bender programs contain data from a total of 154 assayed samples. It does not appear that any of these samples were taken from the Bender mining claim. Of these samples, 110 showed no gold value or only trace amounts, and the remaining 44 samples ranged in grade from .003 ounces to .076 ounces of gold per ton. The samples were assayed between October 3, 1979, and June 19, 1981. The cash flow schedules for the Mt. Baldy and Bender programs indicated that, combined, these programs would produce 652,783 ounces of gold, or 169 times the number *484 of ounces produced by the entire Magdalena Mining District from 1904 through 1977. The Bender program cash flow schedule indicated that 26,471 ounces of gold would be recovered from 90,000 tons of ore with an average grade of .344 ounces of gold per ton. In the fall of 1979, Resources began driving a tunnel (the Springer Tunnel) towards a drill hole (the KL-4 drill hole) that had been sunk by the Superior Oil Company in 1977. The portal or opening to the Springer Tunnel was located north of the caldera margin, approximately 2,400 feet from the Bender mining claim. The tunnel was driven in a northwesterly direction away from both the caldera margin and the Bender mining claim. In 1979, David Smith, Resources' vice-president for operations, expressed misgivings to Mr. Van Zyl about driving the Springer Tunnel, and advised him instead to obtain more information about the Mt. Baldy area by drilling. Mr. Van Zyl rejected the advice and made it clear to Mr. Smith that he was determined to open the Springer Tunnel. By letter dated March 13, 1981, Resources represented to investors in the Bender program that the Springer Tunnel would provide "access to the main ore body in Mt. Baldy." However, *485 the mineralized zone in the area of the KL-4 drill hole was not ore-grade material, and this fact was contained in a 1978 open-file report that was prepared by Robert Blakestad, the Superior Oil Company employee who had supervised the drilling of the KL-4 drill hole. Mr. Van Zyl had access to Mr. Blakestad's report and apparently reviewed it before the Mt. Baldy and Bender programs were offered to investors. Resources never established that ore reserves of any category existed on any of its mining claims in the Mt. Baldy area because (1) it never measured and established the dimensions of any mineralized body on any of the claim sites, and (2) never assayed a statistically meaningful number of samples to determine the grade of any of the claim sites. Other than purportedly improving a four-wheel drive road that crossed the Bender claim site, Resources never performed any work thereon. As of 1980, no annual assessment forms had been filed with the Bureau of Land Management with respect to the Bender mining claim. During the years 1978 to the date of trial, no ore containing economically recoverable amounts of gold or silver was mined from any Resources mining claims in the Mt. Baldy *486 area, including the Bender mining claim. Resources was unable to provide the following documents relating to the Bender program: (a) accounting workpapers, including spread sheets, journal entries, trial balances, and charts of account; (b) labor force summaries; (c) permits and mining licenses; (d) ore sales agreements; (e) field notes or other survey notes prepared by qualified third parties or other agents; (f) billings sent to petitioners for exploration or development expenses; (g) surface or underground sample and assay records with maps; (h) mining and tailing disposal plans approved by either state or Federal agencies, including environmental impact statements; (i) surveyor field books, computation ledgers, and plats of all waste dumps; and (j) mill shift operation reports. The private offering circular for the Bender program promised investors a tax writeoff for 1980 of 3.275 to 1. After reviewing the circular, petitioners Ronald Z. and Shirley A. Krivitsky (hereinafter collectively referred to as petitioners in this section) subscribed to a one-half unit in the program on November 18, 1980. They paid $ 6,000 in cash in 1980, and executed the "Non-Negotiable Recourse Note" *487 contained in the offering circular for $ 13,650. They also executed the "Lease Agreement," the "Joint Operating Agreement," and the "Development and Production Services Agreement" that were contained in the circular. Resources sent petitioners a sample Schedule C showed no income from the program for 1980 and showed a total loss of $ 19,650 (a minimum annual royalty expense of $ 1,400, plus a mining development expense of $ 18,250). On the Schedule C attached to their joint 1980 Federal income tax return, petitioners elected the accrual method of accounting, showed no income from the Bender program, and claimed a loss from the program in the amount suggested by Resources on the sample Schedule C. Petitioners' 1981, 1982, and 1983 joint Federal income tax returns contained no reference total Bender program. By letter dated June 6, 1983, Resources offered to allow petitioners to pay off their $ 13, 650 promissory note without interest, and, if they chose not to, requested that petitioners execute "forms required to obtain a bond necessary to insure collectibility of your note." This request for prepayment of petitioners' note was followed by several other prepayment requests from Resources. *488 The record does not disclose whether petitioners ever made any payment with respect to the note. By notice of deficiency dated June 13, 1984, respondent disallowed, for a variety of reasons, the $ 19,650 loss attributable to the Bender program claimed by petitioners on Schedule C of their 1980 joint Federal income tax return. The Silver Tombstone II Program
The mining claims assigned to the Silver Tombstone II Program (the Tombstone program) were unpatented mining claims located in Cochise County, Arizona, approximately 3 miles west of Tombstone, Arizona. In its 107-year production history, the area where the Tombstone mining claims were located produced only 45,000 tons of silver ore. Prior to Resources' acquisition of the Tombstone mining claims, David Smith visited the claim sites and prepared a report entitled "Report on Tombstone July 1980," which included two pages of data from assayed samples he had taken from the Tombstone claim sites. Twenty of these samples are listed in Mr. Smith's report as samples taken from backhoe and dozer cuts on veins. Of these 20 samples, 15 yielded only traces of silver. The other five samples ranged from 0.15 to 0.38 ounces of silver per ton. *489 Mr Van Zyl personally reviewed this assay data before the Tombstone program was offered to investors. Michael Whyte also visited the Tombstone mining claims and prepared a report dated September 4, 1980, entitled "B & C Mining Property Tombstone, Arizona." This report, which was attached to the private offering circular for the Tombstone program, does not contain Mr. Smith's assay data referred to above. It does contain, however, data from 32 assayed samples gathered by Mr. William D. Tipton in September of 1975 for purposes unrelated to the Tombstone program. In his report, Mr. Whyte acknowledged that "[t]here is little subsurface information available on the B & C mining property" (which is presumably the same property covered by the Tombstone mining claims). Nevertheless, he assumed that there was "continuous mineralization for a depth of 200 feet," and, based in part on this assumption, estimated that there were 950,400 tons of "potential" reserves on the Tombstone claim sites. With respect to the grade of these "potential" reserves, Mr. Whyte stated that an "average assay from 32 samples taken from the surface of the B & C property runs 8.99 oz./ton of silver * * *." The 32 *490 samples referred to by Mr. Whyte are the 32 samples gathered by Mr. Tipton in 1975. Of these 32 samples, 11 range from nil to 0.1 ounces of silver per ton, 12 range from 0.2 to 4.0 ounces of silver per ton, and 9 range from 7.5 to 45.80 ounces of silver per ton. The Resources assay book for the Tombstone program contains data from 226 assayed samples that can be clearly identified as coming from the Tombstone claim sites. Of these samples, 132 were listed as containing only a trace of silver. The remaining samples ranged from 0.10 to 29.39 ounces of silver per ton. The average for all 226 samples was 0.82 ounces of silver per ton. The samples were assayed between July 18, 1980, and July 6, 1981. Despite this assay data, the cash flow schedules for the Tombstone program indicated that the program would process 190,000 tons of ore with a grade of 8.31 ounces of silver per ton. Resources acquired the Tombstone mining claims in September or October of 1980. Lance W. Klump was the manager of operations at the Tombstone claim sites. In a report to Resources dated February 12, 1981, Mr. Klump stated that "[t]he condition of the existing underground work as of 1/12/81 could only be called *491 poor," and that "[s]amples of the ore removed from the adit have been showing nothing of commercial quantity." Mr. Klump also stated that "[a]s of 1/12/81, the leeching operation was inoperative," and that major pieces of equipment were a "constant source of delays" due to "age, past abuse, and lack of maintenance * * *." Despite Mr. Klump's report, in the quarterly progress report to investors in the Tombstone program, dated April 20, 1981, Bernard Van Zyl stated as follows: We are pleased to report that considerable progress has been made in preparing this property for a highly efficient silver producing operation. Much new equipment has been installed and is now operational. This includes a new 7,500 ton per month ore crusher, an agglomerator to pelletize the ore for efficient leaching, a complete laboratory including an atomic absorption unit for assay and chemical analysis of the ore and a 1,250 square foot steel building is now complete. Two new leach pads are currently under construction with completion estimated on or before May 15th. We anticipate full production beginning upon completion of the leach pads.
Operations at the Tombstone claim sites ceased in July of 1981. *492 In 1981, Resources failed to file annual assessment forms with the Bureau of Land Management for the Tombstone mining claims. As a result, the Bureau of Land Management considered these claims to be abandoned by operation of law on December 31, 1981. In 1982, Resources filed with the Bureau of Land Management relocation notices for the Tombstone mining claims. However, in 1983 and 1984 Resources again failed to file annual assessment forms, and the Bureau of Land Management therefore considered the relocated claims to be abandoned on December 31, 1983. Resources never established that ore reserves of any category existed on any of the Tombstone mining claims because (1) it never measured and established the dimensions of any mineralized body on any of the claim sites, and (2) never assay a statistically meaningful number of samples to determine the grade of any mineralized body on any of the claim sites. During the years 1980 to the date of trial, no ore containing economically recoverable amounts of gold or silver was mined from any of the Tombstone program's claim sites in Arizona. Resources was unable to provide the following documents relating to the Tombstone program: (a) documents *493 relating to severance taxes paid to the State of Arizona; (b) mining licenses and permits; (c) documents showing the names of ore transportation contractors, tonnage of ore hauled with dates, and origin and destination of the ore; (d) field notes or other survey notes prepared by third parties or agents; (e) billings sent to petitioners for exploration or development expenses; (f) documents showing the production costs for dump material that might have been processed; and (g) environmental impact statements. The private offering circular for the Tombstone program promised investors a tax writeoff for 1980 of 4 to 1. After reviewing the circular, petitioners Welton E. and Marilyn M. Firehammer (hereinafter sometimes collectively referred to as petitioners in this section) decided to subscribe to a one-half unit in the program, and further decided to participate in the program by means of a grantor trust. On December 22, 1980, petitioners entered into a trust agreement naming petitioner Welton E. Firehammer as grantor and petitioner Marilyn M. Firehammer as trustee. On the same date, petitioner Marilyn M. Firehammer, as trustee for the Welton E. Firehammer Grantor Trust, paid $ 7,500 *494 in cash to Resources, and executed the "Lease Agreement," the "Joint Operating Agreement," and the "Development and Production Services Agreement" that were contained in the private offering circular. Also on December 22, 1980, petitioner Welton E. Firehammer executed a negotiable promissory note payable to Resources on June 1, 1981, for $ 2,500, [15] and also executed the "Non-Negotiable Recourse Promissory Note" that was contained in the private offering circular for $ 20,000. Resources sent petitioners a sample Schedule C for use in reporting income and deductions attributable to their investment in the Tombstone program for 1980. The sample Schedule C showed no income from the program for 1980 and showed a total loss of $ 30,000 (a minimum annual royalty of $ 3,714.50, plus a mining development expense of $ 26,285.50). Petitioners reported no income from the Tombstone program on their 1980 joint Federal income tax return. However, on Schedule E of their 1980 return they claimed a $ 30,000 loss taken in the name of the Welton E. Firehammer Grantor Trust. Petitioners' 1981, 1983, and 1984 joint Federal income tax *495 returns contained no reference to the Tombstone program. On Schedule C of their 1982 joint Federal income tax return, petitioners reported $ 67 of income from the Tombstone program. On September 16, 1985, at the request of either Harry Winderman or Bernard Van Zyl, petitioners filed a Form 1040X for 1980 with the Office of the Internal Revenue Service in Atlanta, Georgia, which states that "[t]axpayer believes expenses originally [sic] deducted on Schedule C also qualify as deductible expenses. [sic] i.e. Exploration expense, -- under I.R.C. section 617 as well as under the description of 'royalties and mining development expense' which was used on the original return." By letter dated November 12, 1982, Resources advised petitioners that it intended to substitute a silver property in Montana for the Tombstone claim sites in Arizona. By letter dated December 29, 1983, Resources advised petitioners that it intended to substitute the New Montana Gold Program for the Tombstone program. In 1984, petitioners began receiving requests from Resources to prepay the $ 20,000 promissory note. After receiving a number of these requests, petitioner Welton E. Firehammer terminated petitioners' *496 interest in the Tombstone program and, in October of 1984, paid Resources $ 1,310.50 in exchange for the $ 20,000 promissory note. Petitioners did not report any income from this transaction on their 1984 Federal income tax return. Petitioner Welton E. Firehammer has a Masters Degree in Commerce and is a certified financial planner. He also has a strong background in tax shelters. Prior to investing in the Tombstone program, Mr. Firehammer did not have an independent mining engineer or geologist investigate Resources' operations or representations, and neither he nor his investment advisor made any effort either to investigate Resources' history or to verify the cash flow projections in the Tombstone program's private offering circular. At trial, Mr. Firehammer did not know where the properties of the programs that had been substituted for the Tombstone program were located. Petitioner Welton E. Firehammer would not have invested in the Tombstone program without the tax benefits promised in the private offering circular. By notice of deficiency dated December 31, 1984, respondent disallowed, for a variety of reasons, the $ 30,000 loss claimed by petitioners in the name of the Welton *497 E. Firehammer Grantor Trust on Schedule E of their 1980 joint Federal income tax return. The Grubstake Gold Program
The mining claims assigned to the Grubstake Gold Program (the Grubstake program) were located in Madison County, Montana, approximately 35 miles southwest of Bozeman, in a region known as the Lower Hot Springs Mining District. Resources acquired the claims in September of 1980, and offered the Grubstake program to investors on or about October 1, 1980. Attached to the private offering circular for the Grubstake program is a geological report on the Grubstake mining claims dated September 8, 1980, purportedly prepared by Michael R. Whyte. In that report, Mr. Whyte noted that he was unable to examine any of the underground working on the Grubstake properties due to their inaccessibility caused by flooding. He nevertheless concluded that there were "ore bearing reserves" on the property which "represent values on the order of 8.5 million dollars. " Mr. Whyte based this conclusion on an undated map, source unknown, showing 20 assayed samples from underground workings on the Grubstake property. Mr. Whyte also stated that "[t]he ore dump on the property will run about *498 15,000 tons of material, averaging 0.04 oz. of gold per ton * * *." The underground workings on the Grubstake property were full of water or caved in during 1980 and remained so until Resources dewatered the Grubstake mine to the 270-foot level in the spring of 1981. In June and July of 1981, Resources collected 82 samples from the Grubstake mine before it allowed the mine again to fill with water. Of the 82 samples collected, 45 contained only a trace of gold and 57 contained only a trace of silver. The 82 samples averaged 0.07 ounces of gold per ton and 0.29 ounces of silver per ton. These grades were not ore grade for an underground mine with major water problems. Despite this assay data, the cash flow schedules for the Grubstake program indicated that the program would process 7,535 tons of ore with an in-place grade of 2.076 ounces of gold per ton. In 1983 Resources began constructing a mill on the Grubstake claim site for the purpose of processing dump material. The mill was never completed and ceased operation in the winter of 1983. Sam Phifer, Resources' operation manager at the Grubstake site, advised Resources to do additional sampling before proceeding with the mill, *499 but the advice was rejected. Mr. Phifer also advised Mr. Van Zyl not to locate the mill on the Grubstake property because it was "uphill" from the other mine sites, and it would therefore be difficult getting trucks up to the mill to feed it. This advice was also rejected. At the time Mr. Phifer was hired by Resources in 1982, Mr. Phifer told Mr. Van Zyl "that it takes three things to make a mine: reserves, reserves, and reserves, and if you don't have those, everything else is of not much consequence." Mr. Van Zyl responded to this statement by assuring Mr. Phifer that Resources had plenty of reserves. Resources' operations at the Grubstake claim sites ceased in March of 1984. Resources failed to establish that proven ore reserves existed on any of the Grubstake claim sites because (1) it never measured and established the dimensions of any mineralized body on any of the claim sites, and (2) never assayed a statistically meaningful number of samples to determine the grade of any mineralized body on any of the claim sites. Resources was unable to provide the following documents relating to the Grubstake program: (a) accounting workpapers, including spread sheets, journal entries, *500 trial balances, and charts of account; (b) mining licenses and permits; (c) documents showing names and addresses of ore transportation contractors, tonnage of ore hauled with dates, and the origin and destination of the ore; (d) billings sent to petitioners for exploration or development expenses; (e) documents showing production costs for dump material that was processed and sold; (f) surveyors' field books, computation ledgers, and plats for all waste dumps; (g) documents containing drill hole information; and (h) plats of all waste dumps showing the location of sample trenches or pits. The private offering circular for the Grubstake program promised investors a tax writeoff for 1980 of 4 to 1. After reviewing the circular, petitioner Hugh S. Dewitt (hereinafter referred to as petitioner in this section) subscribed to a one-half unit in the program on December 1, 1980. On that date, he paid $ 7,500 in cash, executed a negotiable promissory note payable to Resources on June 1, 1981, for $ 3,750, [16] and was executed the "Non-Negotiable Recourse Promissory Note" contained in the offering circular for $ 18,750. Also on December 1, 1980, petitioner executed the "Lease Agreement," *501 the "Joint Operating Agreement," and the "Development and Production Services Agreement" that were attached to the offering circular. Resources sent petitioner a sample Schedule C for use in reporting income and deductions attributable to his investment in the Grubstake program for 1980. The sample Schedule C showed no income from the program for 1980 and showed a total loss of $ 30,000 (a minimum annual royalty of $ 3,714.50, plus a mining development expense of $ 26,285.50). On the Schedule C attached to petitioner's 1980 Federal income tax return, petitioner elected the accrual method of accounting, reported no income from the Grubstake program, and claimed a loss from the program in the amount suggested by Resources on the sample Schedule C. In late 1985, at the suggestion of Harry Winderman, petitioner filed a Form 1040X for 1980, claiming that his 1980 claimed Grubstake losses, in addition to being royalties and mining development expenses, were also exploration expenses within the meaning of section 617. By letter dated May 24, 1983, resources advised petitioner that he could prepay his $ 18,750 promissory note without interest, *502 and if he chose not to, requested that he execute "forms required to obtain a bond necessary to insure the collectibility of your note * * *." After receiving a number of requests from Resources to prepay his note, petitioner terminated his interest in the Grubstake program and, in late 1984, paid Resources approximately $ 1,500 in exchange for his $ 18,750 promissory note. Petitioner did not report any income with respect to this transaction on his 1984 Federal income tax return. At the time of trial, petitioner had no college degrees and had been involved in the mortgage banking business for 32 years. He became aware of the Grubstake program through his investment advisor, Copy Groom. Mr. Groom was not a mining engineer and did not have any mining experience or background. Petitioner never investigated and did not have third parties investigate Resources' prior activities in the mining industry. Petitioner's primary purpose in investing in the Grubstake program was to obtain the promised tax benefits. By notice of deficiency dated November 20, 1984, respondent disallowed, for a variety of reasons, the $ 30,000 loss attributable to the Grubstake program claimed on Schedule C of *503 petitioner's 1980 Federal income tax return. The Madison Gold Program
The mining claim assigned to the Madison Gold Program (the Madison program) were located in Madison County, Montana, approximately 35 miles southwest of Bozeman, in a region known as the Lower Hot Springs Mining District. The Madison claim sites were near but not contiguous to the Grubstake claim sites. Resources acquired the Madison mining claims by lease dated September 1, 1982, and offered the Madison program to investors on or about September 15, 1982. A large dump site known as the Boaz dump, and an underground mine known as the Boaz mine, were located on the Madison claim sites. The mine had been abandoned in 1947 or early 1948, and was flooded and inaccessible when Resources acquired the Madison claims. Resources never sampled the interior of the Boaz mine and never did any core drilling in an effort to measure reserves in the mine. As a result, Resources never determined that the Boaz mine contained reserves of any category. With respect to the Boaz dump, Resources made some shallow cuts on the surface, but never sampled the interior of the dump, which was approximately 100 feet high and 200 feet wide *504 at the base. These efforts were wholly inadequate for purposes of determining the grade of the dump material. Despite the fact that Resources never determined that ore reserves existed on any of the Madison claim sites, the cash flow schedules for the Madison program indicated that the program would generate gross revenues over 6 years of $ 11 million. Resources used the funds obtained from investors in the Madison program, not to explode the Madison claim sites for ore reserves, but to construct the Grubstake mill. Attached as Appendix A to the private offering circular for the Madison program was a geological report by Michael R. Whyte, dated September 6, 1982, entitled "Economic Potential of the Madison Group of Mining Claims, Norris, Montana." In that report, Mr. Whyte stated that "the Madison Group will be split into two blocks of patented mining claims," and he estimated that each block would contain an "inferred resource" of 93,750 tons (or 56,250 tons after applying a 60-percent recovery factor). Immediately following Mr. Whyte's report in the private offering circular was an "Open Letter to Resources America, Inc.," dated September 6, 1982, and signed by a Dr. John R. *505 MacMillan. In that letter, Dr. MacMillan stated as follows: Given the available references, I find Whyte's report to be very readable, reliable and succinct. His estimate of * * * potential resource is clearly reached and correctly, in my opinion, a conservative estimate. However, in an affidavit subscribed to on June 26, 1984, Dr. MacMillan stated as follows: In preparing all my letters to Resources America, Inc., I only had available to me Mr. Whyte's report and the same literature which was listed by Mr. Whyte in his Madison Report on prior mining on the Montana claims. I did not have any assay books, field records or any other type of raw data. I was never told by Mr. Whyte that he had consulted an attorney who advised Mr. Whyte not to use the the term "resource" in order to protect himself. I did use the term "reserves" in several of my letters but considered these to be only estimates, as is indicated in my letters. My letters were addressing only estimated volume of the vein above a certain depth. It is my opinion that the term "resources" better describes the property and mineral content on these claims at the time I wrote my letters. There is no assay value in my letters *506 or Mr. Whyte's reports, and in my opinion, without assay values, reserves cannot be calculated. In my opinion, Resources America was at the reconnaissance stage at the time I wrote my letters. If Resources America had no other information than that contained in my letters or Mr. Whyte's reports, then, in my opinion, Resources America remained at the reconnaissance stage even after my letters and Mr. Whyte's reports were written. Given my letters or Mr. Whyte's reports, a calculation of reserves, in my opinion, could not be done on the basis of these documents. Based on my review of the prospectus for the Madison, Montana and Birdia offerings, in order to make the calculations of cash flow projection made in the offerings would require information in addition to that provided by either Mr. Whyte or me. Such additional information would include: 1. Data on ore grade and the relationship of ore grade to location in the vein. 2. Additional data to make a more precise estimate of volume. 3. Additional data on the cost of extracting the ore. During the years 1982 to the date of trial, no ore containing economically recoverable amounts of gold or silver was mined by Resources or its *507 agents from any of the Madison program's claim sites. The private offering circular for the Madison program promised a tax writeoff for investors of approximately 3 to 1. In order to participate in the program, investors were required to execute the "Sublease Agreement," the "Joint Operating Agreement," and the "Development and Production Services Agreement" that were contained in the circular. In addition, for each unit purchased in the program, investors were required to pay $ 15,000 in cash and execute a promissory note, payable to Resources on December 31, 1987, for $ 30,000. After reviewing the private offering circular for the Madison gold Program, petitioners Fred W. and Barbara Gahr (hereinafter collectively referred to as petitioners in this section) subscribed to one unit in the program in 1982. Resources sent petitioners a sample Schedule C for use in reporting income and deductions attributable to their investment in the program for 1982. The sample Schedule C showed no income from the program for 1982 and showed a total loss of $ 45,000 (a minimum annual royalty of $ 1,000, plus a mining and development expense of $ 44,000). On the Schedule C attached to their joint *508 1982 Federal income tax return, petitioners elected the cash method of accounting, reported no income from the Madison program, and claimed a loss from the program in the amount suggested by Resources on the sample Schedule C. Petitioners' 1983 and 1984 joint Federal income tax returns contained no reference to the Madison Gold Program. By notice of deficiency dated July 12, 1985, respondent disallowed, for a variety of reasons, the $ 45,000 loss attributable to the Madison Gold Program claimed on Schedule C of petitioners' 1982 joint Federal income tax return. Bernard Van Zyl and Resources America, Inc.
At the time of trial, Bernard Van Zyl had more than 24 years of experience in the mining industry. He was a member of both the American Society of Mechanical Engineers and the Society of Mining Engineers of the American Institute of Mining Metallurgical and Petroleum Engineers, and he received a Bachelor of Science Degree in Mechanical Engineering from Pennsylvania State University. In 1974, Mr. Van Zyl formed Resources America, Inc., purportedly to explore for and develop mineral deposits. At all times relevant to these cases, Mr. Van Zyl was the president, director, and sole stockholder *509 of Resources. From 1977 through 1983, Resources sponsored and offered to investors 22 gold and silver mining investment programs, including the programs at issue in these cases. None of these programs ever made a profit. The total cash invested by investors in Resources' programs from 1977 through 1983 was $ 9,353,658, and the total losses claimed were $ 30,313,913. At all times relevant to these cases, Bernard Van Zyl was actively involved in every aspect of Resources' operations. He hired and fired personnel, selected properties for the mining investment programs, visited the properties on a regular basis and often directed operations at the claim sites, communicated frequently with field personnel, compiled the private offering circulars for the programs and personally prepared the cash flow projections contained therein, reviewed and approved all correspondence and reports to investors, and had ultimate authority over all Resources policies and activities conducted on the mining programs' claim sites. Mr. Van Zyl also was familiar with Bureau of Land Management requirements relating to assessment work on unpatented mining claims during the years in issue. On April 13, 1984, *510 the United States of America filed a Complaint for Permanent Injunction and Other Equitable Relief in the United States District Court for the Middle District of Florida, alleging that Bernard Van Zyl, Harry Winderman, and Resources American, Inc., had promoted abusive tax shelters. The United States specifically alleged in the complaint that the Madison Gold Program was an abusive tax shelter. On August 5, 1985, Bernard Van Zyl, Harry Winderman, and Resources filed in the United States District Court for the Middle District of Florida a Motion for Entry of Final Judgment of Permanent Injunction Against Bernard Van Zyl, Harry Winderman and Resources America, Inc., in which they admitted that they had promoted abusive tax shelters in violation of section 6700. Also in 1985, Resources filed for Bankruptcy under Chapter 11. OPINION We must decide whether petitioners are entitled to deduct their claimed losses from the mining programs in question. The losses claimed by petitioners allegedly represent royalty expenses and mining development or exploration expenses. Since respondent's determination that petitioners' claimed losses are not deductible is presumptively correct, petitioners *511 bear the burden of proving that they are entitled to deduct their claimed losses. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). Respondent asserts that petitioners' claimed losses are not deductible because neither petitioners nor Resources, nor any of the mining activities with the predominant purpose and intention of making a profit. Respondent also argues, in the alternative, that (1) petitioners' claimed losses are not deductible as "mining exploration expenses" under section 617 because petitioners did not make a timely election under that section, and never substantiated that such expenses actually were incurred; (2) petitioners' claimed losses are not deductible as "mining development expenses" under section 616 because petitioners never substantiated that such expenses were incurred or, if incurred, that such expenses were incurred after commercially marketable quantities of ore had been discovered; (3) petitioners' claimed losses should not include the promissory notes executed by petitioners because the notes were contingent liabilities, payable only in the event the mining programs were successful; (4) petitioners' claimed losses should not include the promissory *512 notes executed by petitioners because petitioners were not "at risk" within the meaning of section 465 for any amounts represented by the notes; and (5) petitioners' claimed losses should be disallowed because the allowance of the losses would create a material distortion of income under sections 446 and 461. We agree with respondent that petitioners' claimed losses are not deductible as royalties under section 162(a), mining exploration expenses under section 617(a), or mining development expenses under section 616(a) unless the activities giving rise to the losses were engaged in with the predominant purpose and intention of making a profit. Thomas v. Commissioner,84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Ramsay v. Commissioner,83 T.C. 793, 810 (1984); see Snyder v. Commissioner,86 T.C. 567, 579 (1986); Parker v. Commissioner,86 T.C. 547, 558-559 (1986). Indeed, petitioners do not argue otherwise.[17] We therefore first consider, without deciding whether petitioners properly have characterized their claimed losses as royalties and mining development or exploration expenses, whether the mining activities giving rise to petitioners' claimed losses were motivated *513 by the requisite intention to make a profit. [18] Our decision is not difficult. The issue of whether an individual or a partnership is engaged in an activity with the predominant purpose and intention of making a profit is one of fact, to be resolved on the basis of all the facts and circumstances of the case, and the burden of proving the requisite intention is upon petitioner. Gefen v. Commissioner,87 T.C. 1471, 1497 (1986); Thomas v. Commissioner,supra at 1269; Ramsay v. Commissioner,supra at 810-811. "Profit" in this context means economic profit, that is, profit exclusive of tax benefits. Ramsay v. Commissioner,supra at 810. While the expectation of profit need *514 not be a reasonable one, there must be a bona fide objective of realizing a profit, and greater weight should be given to objective facts than to mere statements of intent. Gefen v. Commissioner,supra at 1497; Thomas v. Commissioner,supra at 1269. Some of the factors that may be helpful in determining whether an activity is engaged in for profit are set forth in the regulations. See sec. 1.183-2(b), Income Tax Regs. These factors are not applicable to every case, however, and a careful review of the facts and circumstances of each case remains the primary test. Gefen v. Commissioner,supra at 1497. In cases involving partnership activities, we have held that the profit-motive analysis should be made at the partnership level. Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Siegel v. Commissioner,78 T.C. 659, 698 (1982). However, in cases involving an election under section 761(a), that is, an election by members of a partnership to exclude the partnership from the application of the provisions of subchapter K, we have left unresolved the issue of whether the profit-motive analysis should be made at the partnership or the partner level. *515 Thomas v. Commissioner,supra at 1269-1270; Ramsay v. Commissioner,supra at 811; Rosenfeld v. Commissioner,82 T.C. 105, 113 n. 13 (1984). In these cases, petitioners made section 761(a) elections for their respective mining programs. Petitioners appear to argue that, because of these elections, the profit-motive analysis should be performed at the partner or investor level and not at the partnership or mining program level. On the other hand, respondent argues that, notwithstanding the section 761(a) elections, the profit-motive analysis should continue to be performed at the partnership or mining program level. The instant cases do not present the proper setting in which to resolve the question of what effect a section 761(a) election has on the profit-motive analysis. Resolution of the issue would not affect the ultimate disposition of these cases because we conclude, for the reasons stated below, that petitioners have failed to establish that either they or the mining programs in question engaged in the activities giving rise to the claimed losses in these cases with the predominant purpose and intention of making a profit. Accordingly, we do not decide herein what effect, *516 if any, a section 761(a) election has on the profit-motive analysis. We also express no view as to whether the mining programs at issue in these cases were in fact partnerships within the meaning of section 761. The Resources mining programs at issue in these cases are identical in all material respects to the Resources mining programs we considered in Ramsay v. Commissioner,supra. In Ramsay, we held that the activities of the mining programs there at issue were not engaged in with the predominant purpose and intention of making a profit because (1) the private offering circulars for the programs contained glaring errors and misrepresentations; (2) at best, Resources purposefully refused to ascertain the truth of the matters asserted in the documents presented to investors; (3) there was no evidence that the investors did anything other than passively accept the investment packages offered by Resources; (4) Resources never made any effort to determine the economic realities underlying the mining programs; (5) Resources failed to operate the mining programs in a manner even remotely approaching accepted mining industry practice; (6) the bulk of the losses claimed by investors were *517 represented by nonrecourse notes; (7) there was no evidence that other Resources mining programs had ever resulted in anything other than large losses; and (8) there was no evidence that any of the investors ever actually made payments on the nonrecourse notes. Ramsay v. Commissioner,supra at 813-821. All of these elements are present in the instant cases. Essentially, petitioners have claimed 3-to-1 or 4-to-1 "leveraged" tax deductions based upon nonrecourse financing, which is payable only out of the proceeds, if any, realized from the sale of ore by the mining programs. [19] *518 Even more simply, petitioners have attempted to purchase a $ 3 or $ 4 tax deduction with every $ 1 paid to Resources, and Resources and Bernard Van Zyl have attempted to secure petitioners' tax deductions by providing a facade, and nothing more, of a legitimate mining activity. After carefully reviewing the entire record in these cases, we conclude that the facts of these cases are indistinguishable from the facts of Ramsay. Having reached this conclusion, we see no reason to comment on all aspects of our findings of fact herein, which, in our view, speak for themselves. We simply conclude, as we did in Ramsay with respect to the Resources mining programs involved therein, that the Resources mining programs involved in these cases "were abusive tax shelters designed with a primary view to achieving substantial tax benefits and carried out with a complete indifference to economic profit." Ramsay v. Commissioner,supra at 812. Petitioners *519 attempt to distinguish Ramsay from these cases essentially on two grounds. They first argue that in Ramsay, none of the taxpayers testified, whereas in these cases, petitioners Hugh S. Dewitt and Welton E. Firehammer testified. Petitioners also argue that in Ramsay we found Bernard Van Zyl to be incompetent, whereas in these cases, the record demonstrates "that by 1980 Mr. Van Zyl had received sufficient background and experience to fully perform as the president of a profit oriented small mining company," but that he was ill-served when he justifiably relied on incompetent subordinates, particularly Michael Whyte. [20] *520 We acknowledge that in Ramsay, none of the taxpayers testified, and that in these cases, petitioners Hugh S. Dewitt and Welton E. Firehammer testified. We also note, however, that petitioner Hugh S. Dewitt testified that he did not have any background in the mining industry; that his investment advisor did not have any background in the mining industry; that he never investigated and did not have third parties investigate Resources' prior activities in the mining industry; that he relied solely on his investment advisor and his review of the Grubstake private offering circular in making his decision to invest in the Grubstake program; and that he invested in the Grubstake program primarily to obtain the tax benefits. Similarly, petitioner Welton E. Firehammer testified that he did not have any background in the mining *521 industry; that his investment advisor had no experience or background in the mining industry; that neither he nor his investment advisor made any effort to investigate Resources' prior activities in the mining industry or to verify the cash flow projections contained in the Tombstone private offering circular; that he did not know where the properties substituted for the Tombstone properties in Arizona were located; and that he would not have invested in the Tombstone program without the tax benefits. This testimony by petitioners Hugh S. Dewitt and Welton E. Firehammer hardly persuades us that they, or any of the other petitioners in these cases, invested in their respective mining programs with the predominant purpose and intention of making a profit. To the contrary, we draw just the opposite conclusion from this testimony. We also note that, other than petitioners Hugh S. Dewitt and Welton E. Firehammer, no other petitioners testified in these cases. Petitioners also argue that in Ramsay we found Bernard Van Zyl to be incompetent, but that in these cases, the record demonstrates that Mr. Van Zyl was competent and well-meaning but ill-served by his subordinates. In Ramsay, contrary *522 to petitioners' assertion, we did not find Bernard Van Zyl to be incompetent, nor do we express any view as to his competency here. However, we do find it necessary to address petitioners' assertion that Bernard Van Zyl was the well-meaning victim of incompetent subordinates. [21]
The record in these cases conclusively establishes that Bernard Van Zyl was in complete control of every aspect of Resources' operations, that his subordinates did only what he told them to do, and that it was Bernard Van Zyl and not his subordinates who was responsible for the mining programs' deficiencies and failures. Mr. Van Zyl was the president, director, and sole stockholder of Resources. He hired and fired personnel, selected the properties for the mining programs, visited the properties on a regular basis and often directed operations thereon, communicated frequently with field personnel, reviewed all reports and assay data relating to the claim sites, compiled the private offering circulars for the programs and personally prepared the cash flow projections contained therein, reviewed *523 and approved all correspondence and reports sent to investors, and had ultimate authority over all Resources policies and activities conducted on the mining programs' claim sites. When David Smith advised Mr. Van Zyl to do more sampling before driving the Springer Tunnel, Mr. Van Zyl rejected the advice and insisted on driving the tunnel through what amounted to barren rock, towards a drill hole in a region that Mr. Van Zyl knew did not contain ore-grade material. When Michael Whyte requested more time and money to prepare an adequate report on the Mt. Baldy claim sites, Mr. Van Zyl rejected the request, claiming that there was not enough time or money. When Sam Phifer advised Mr. Van Zyl to do more sampling before constructing the Grubstake mill, Mr. Van Zyl rejected the advice and insisted on building the mill, again contrary to Mr. Phifer's advice, uphill from the other claim sites. We also note that Mr. Van Zyl had reason to question Michael Whyte's abilities as early as 1978, when he received the letter from Dr. Joralemon criticizing a report by Mr. Whyte on the Mt. Baldy area, yet Mr. Van Zyl continued to rely exclusively on Mr. Whyte for the geological reports contained in *524 the mining programs' offering circulars. We finally note that Mr. Van Zyl had more than 24 years of experience in the mining industry at the time of trial, and that he knew, as Mr. Phifer told him, "that it takes three things to make a mine: reserves, reserves, and reserves, and if you don't have those, everything else is of not much consequence." On these facts, we can only conclude that, contrary to petitioners' suggestion, Mr. Van Zyl was not a well-meaning victim of incompetent subordinates, but that he, and not his subordinates, was responsible for the mining programs' deficiencies and failures. We further conclude that Mr. Van Zyl knew precisely what he was doing with respect to the mining programs in question, and what he was doing was selling tax deductions to investors and attempting to engage in just enough activity at the programs' claim sites to persuade the Internal Revenue Service that Resources was engaged in bona fide mining activities. It follows that neither Bernard Van Zyl nor Resources engaged in any activities with respect to the mining programs with the predominant purpose and intention of making a profit. Having concluded that that facts of these cases are indistinguishable *525 from the facts of Ramsay, and therefore that petitioners have failed to carry their burden of proving that the activities giving rise to their claimed losses were engaged in with the predominant purpose and intention of making a profit, we need not consider respondent's alternative arguments supporting his disallowance of the claimed losses. Respondent also argues that petitioners' underpayments of taxes in these cases are substantial underpayments attributable to tax motivated transactions within the meaning of section 6621(c), and therefore that petitioners are liable for additional interest under that section. Petitioners in docket No. 37996-85 bear the burden of proof with respect to this issue, and respondent bears the burden of proof with respect to this issue in the other dockets, having raised it for the first time in those dockets by amended answers. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933); Zirker v. Commissioner,87 T.C. 970, 981 (1986). Section 6621(c) provides for an increased rate of interest with respect to any "substantial underpayment" (greater than $ 1,000) "attributable to 1 or more tax motivated transactions." Sec. 6621(c)(1) and (2). The increased *526 rate applies to interest accruing after December 31, 1984. Respondent's temporary regulations provide that -- Deductions disallowed under the following provisions are considered to be attributable to tax motivated transactions: (1) Any deduction disallowed for any period under section 183, relating to an activity engaged in by an individual * * * that is not engaged in for profit, and (2) Any deduction disallowed for any period under section 165(c)(2), relating to any transaction not entered into for profit. [Sec. 301.6621-2T, A-4, Proced. & Admin. Regs. (Temporary), T.D. 7998, 1985-1 C.B. 368, 369-370, 49 Fed. Reg. 50392 (Dec. 28, 1984)]. We have already held that the activities giving rise to the claimed losses in these cases were not engaged in with the predominant purpose and intention of making a profit. It follows that petitioners' losses are not allowable under section 183 or section 165(c)(2), and that petitioners' claimed losses are therefore attributable to tax motivated transactions within the meaning of section 6621(c). Accordingly, the increased rate of interest provided for in section 6621(c) is applicable to the underpayments attributable to petitioners' disallowed *527 losses. [22] We must finally decide whether petitioners are liable for damages pursuant to section 6673. [23] *529 We have already held that the facts of these cases are indistinguishable from the facts of Ramsay. We also note that petitioners' counsel in these cases, Harry Winderman, was also counsel for the taxpayers in Ramsay. Notwithstanding Ramsay, petitioners litigated these cases for 9 days, presented no meritorious arguments to distinguish *528 their cases from Ramsay, and made no proposed findings of fact as required by the rules of this Court. We take special note of Mr. Van Zyl's letter to petitioners, dated October 9, 1981, which we repeat, in part, here: The time it will take from the time of filing the Petition with the Tax Court, until the final resolution of these issues may take several years. Mr. Winderman has indicated to us that a present, there are thirty-five thousand cases before the United States Tax Court, which at present only has nineteen judges. On an average, the United States Tax Court only hears fifteen hundred cases a year. In addition to this current backlog, there are [sic] some two hundred thousand taxpayers under audit at the end of 1979 for tax shelter related deductions. Unless something drastic is done, it is Mr. Winderman's opinion that it will be several years before these matters will be resolved in the United States Tax Court. For so long as it takes to resolve the issue in the United States Tax Court, the Internal Revenue Service cannot demand or require payment of tax from you. * * * After carefully reviewing the entire record in these cases, we find petitioners' positions to be frivolous and groundless, and that these proceedings were instituted and maintained primarily for delay. We remind other taxpayers and their counsel, and particularly other taxpayers who were involved in Resources mining programs, not to maintain before this Court either frivolous proceedings or proceedings primarily for delay. At respondent's request, we award damages to the United States under section 6673 in the maximum amount of $ 5,000 for each docket consolidated herein, for a total amount of $ 20,000. Decisions will be entered for the respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Hugh S. Dewitt and Imelda W. Dewitt, docket No. 3451-85; Welton E. Firehammer and Marilyn M. Firehammer, docket No. 7461-85; and Fred W. Gahr and Barbara Gahr, docket No. 37996-85. ↩
2. Respondent cites sec. 6621(d) in his pleadings and briefs. Sec. 6621(d) has been redesignated as sec. 6621(c), effective 1986, Pub. L. 99-514, 100 Stat. 2744. We therefore refer to this section as sec. 6621(c)↩ herein. Unless otherwise indicated, all other sections referred to herein are sections of the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all rules referred to are rules of the Tax Court Rules of Practice and Procedure. 3. We note that petitioners have made our task more difficult in these cases by failing to make proposed findings of fact in the form prescribed by Rule 151(e)(3). ↩
4. The Bender program was offered to investors on July 15, 1980; the Silver Tombstone II and Grubstake programs were offered to investors on October 1, 1980; and the Madison program was offered to investors on September 15, 1982. ↩
5. The contract miner for the Madison program was Resources America Mining Company (Ramco), a wholly owned division of Resources, rather than Minerex. ↩
6. The offering circular for the Madison program contained a "Sublease Agreement" instead of a "Lease Agreement." ↩
7. Rather than a "Non-Negotiable Recourse Promissory Note," the offering circular for the Bender program contained a "Non-Negotiable Recourse Note," and the offering circular for the Madison program contained a "Promissory Note." ↩
8. The "Sublease Agreement" contained in the offering circular for the Madison program is identical in all material respects to the "Lease Agreement" contained in the other offering circulars and quoted in the text herein. ↩
9. The "Promissory Note" contained in the offering circular for the Madison program was payable to Resources rather than Minerex, carried interest at a rate of 9 percent rather than 6 percent, was due on December 31, 1987, rather than December 31, 1991, and did not state that it was non-negotiable and could not be assigned. 10. The "Development and Production Services Agreement" contained in the offering circular for the Madison program provided that the Co-owners were "desirous of obtaining the services of Ramco" rather than Minerex. See note 5, supra.↩
11. Ramco rather than Minerex served as the contract miner for the Madison Gold Program. ↩
12. In addition to the cash payments, the Silver Tombstone II and Grubstake programs required their investors to execute negotiable promissory notes payable to the contract miner on June 1, 1981, in the aggregate amounts of $ 175,000 and $ 262,500, respectively. 13. The "Development and Production Services Agreement" contained in the offering circular for the Madison Gold Program provided that the "Notes shall be payable together with accrued interest on the remaining principal balance at the rate of nine percent (9%) per annum on or before December 31, 1987." See note 9, supra.↩
14. The foregoing is not intended to be a definitive or comprehensive discussion of mining industry practice. It is intended merely to provide a very broad overview of limited aspects of typical mining practice and terminology. ↩
15. Petitioner Marilyn M. Firehammer paid this note on May 30, 1981. ↩
16. Petitioner paid this note on May 29, 1981. ↩
17. Petitioners also do not argue that their claimed losses are deductible under any other sections. ↩
18. As discussed more fully later in this opinion, we find Ramsay v. Commissioner,83 T.C. 793 (1984), to be controlling on this issue. Consequently, we do not analyze the mining programs and transactions at issue herein using the "unified approach" of Rose v. Commissioner,88 T.C. 386, 414 (1987). We note, however, that the result we reach in these cases would not be different had we used the unified approach of Rose.↩
19. The promissory notes executed by the petitioners who invested in the Bender, Tombstone, and Grubstake programs were labeled "recourse" notes. These notes were not recourse notes, however, because the "Development and Production Services Agreement" these petitioners executed provided that the notes were payable only out of the proceeds realized from the sale of ore by their respective mining programs. Similarly, the "Promissory Note" executed by petitioners Fred W. and Barbara Gahr was not a recourse promissory note because the "Development and Production Services Agreement" they executed provided that their note was payable only out of proceeds realized from the sale of ore by the Madison program. Consequently, the promissory notes executed by petitioners in these cases were not different than the nonrecourse notes executed by the taxpayers in Ramsay.↩
20. Petitioners also attempt to distinguish Ramsay from these cases by asserting that (1) "each property was a 'Discovery' (reasonable chance of success)," (2) "the prospects were in known mining districts which * * * were not long dormant but in fact were being mined at the time of each Program," (3) "precious metals prices were at record post war levels during this period," (4) "Petitioners reasonably believed Michael Whyte, David Smith * * * [and others] were competent and never heard anything to the contrary," (5) "trained mining personnel could not and did not discover any incompetence," (6) "Petitioners believed that their notes were fully recourse," and (7) "Resources America appeared to be mining and developing properties which contained substantial ore reserves." The record does not support these assertions. Moreover, even if the assertions were true, in the context of these cases, we do not find any of them to be significant. 21. On the record before us, were we to adopt this assertion, it would be the very best petitioners could hope for. ↩
22. In his amended answers, respondent asserted that petitioners' underpayments of taxes were underpayments attributable to tax motivated transactions because they involved valuation overstatements within the meaning of section 6659(c). See sec. 6621(c)(3)(A)(i). Also in his amended answers, respondent made a general prayer for the application of section 6621(c) to the underpayments in these cases. In view of our holding that the activities giving rise to petitioners' claimed losses were not engaged in with the predominant purpose and intention of making a profit, we need not consider whether petitioners' underpayments involved valuation overstatements within the meaning of section 6659(c). See Patin v. Commissioner,88 T.C. 1086, 1127-1129↩ (1987). 23. Sec. 6673. DAMAGES ASSESSABLE FOR INSTITUTING PROCEEDINGS BEFORE THE TAX COURT PRIMARILY FOR DELAY, ETC. Whenever it appears to the Tax Court that proceedings before it have been instituted or maintained by the taxpayer primarily for delay or that the taxpayer's position in such proceedings is frivolous or groundless, damages in an amount not in excess of $ 5,000 shall be awarded to the United States by the Tax Court in its decision. Damages so awarded shall be assessed at the same time as the deficiency and shall be paid upon notice and demand from the Secretary and shall be collected as a part of the tax. ↩